In re ROBERT BOGETTI
& SONS, Debtor.

ROBERT BOGETTI & SONS, Plaintiff,

v.

BANK OF AMERICA NT & SA, Successor in Interest to Security Pacific
National Bank, Defendant.

Bankruptcy No. 92–95198–11.
Adv. No. 93–9044.

United States Bankruptcy Court,
E.D. California.

Oct. 8, 1993.

John D. Bessey, Sacramento, CA, for debtor.

William H. Parrish, Stockton, CA, for defendant.

## MEMORANDUM DECISION

### (Amended)

JOSEPH W. HEDRICK, Jr., Bankruptcy Judge.

This matter comes before the court on complaint of debtor Robert Bogetti & Sons (the "Partnership") against Bank of America ("Bank") to determine the extent, validity, and priority of lien claimed by Bank. Evidence and arguments were presented at trial on September 24, 1993, after which the matter was taken under submission.

### BACKGROUND

For several years prior to filing Chapter 11 bankruptcy in December 1992 and during the pendency of this case, the Partnership has engaged in farming operations. The Partnership's primary operations are growing beans on thirteen parcels of land located in San Joaquin and Stanislaus Counties. Bank asserts to have a $2.0 million perfected security interest in beans and proceeds of beans grown by the Partnership for the 1989 through 1992 crop years presently stored or on account with independent third-party agricultural cooperatives.

In June 1990, Bank agreed to loan up to $1.7 million to the Partnership on a revolving note to fund farming operations. In August 1991, the debt was renewed and restructured, and a new revolving note with a maximum loan amount of $2.0 million was executed by the parties.

Both notes were secured by identical form security agreements provided by Bank and signed by general partners of the Partnership. These security agreements were signed on the same date as the revolving notes and secured payment of debts incurred under the revolving notes and all other preexisting or future debt incurred by the Partnership. The description of the collateral after the granting language was in printed form and provided in relevant part as follows:

A. All farm products of whatsoever kind or nature, including all crops now growing or hereafter to be grown or timber to be cut on that certain real property described below; and also including all livestock and supplies used or produced in farming operations.

B. ....

C. All present and future accounts, chattel paper, documents, notes, drafts, instruments, contract rights, general intangibles and returned goods.

D. All proceeds and products of the foregoing.

The security agreements referenced five parcels of land with legal descriptions attached as exhibits A through E.

Concurrent with execution of the June 1990 revolving note and security agreement, the parties executed financing statements which Bank filed with the Secretary of State and with the recorder's offices in San Joaquin and Stanislaus Counties. The financing statements were printed forms approved by the Secretary of State. Item 6 provided in printed form as follows:

This FINANCING STATEMENT covers the following types of items of property in which Debtor grants to Secured Party a security interest....

Under item 6, Bank typed in a description of collateral which for the most part restated the collateral granted in the security agreement except for including a reference to after-acquired farm products which did not appear in the security agreements.

All crops now being grown or hereafter grown on real property described as follows: See Exhibits A, B, C, D, and E

attached hereto and made a part hereof, all farm products of whatsoever kind and nature now owned or hereafter acquired by debtor. All present and future accounts, chattel paper, documents, notes, intangibles and returned goods. All proceeds and products of the foregoing.

Descriptions of the five parcels reference in the security agreement were attached as Exhibits A through E.[1]

By December 16, 1992, when the Partnership filed Chapter 11, it owed $1,989,622.67 in principal and $164,889.32 in interest for a total debt under the secured revolving notes of $2,154,511.99.

Assets on the date of filing listed in the Partnership schedules included beans and proceeds from the sale of beans harvested in 1989, 1991, and 1992 from all thirteen parcels farmed by the Partnership. The 1989 and 1991 crop was stored with Rhodes Bean and Supply Company. ("Rhodes"). Under the Partnership's agreement with Rhodes, upon harvest the beans were trucked to Rhodes processing facilities where the beans were clean, bagged, and made ready for sale. Under normal procedures, Rhodes would sell the beans and account to the Partnership for the proceeds after deducting costs, fees, and/or commissions. The 1992 crop was stored at a Vernalis, California, warehouse ("Vernalis Warehouse") owned by independent third parties which apparently operated under a cooperative agreement similar to the Partnership's agreement with Rhodes.[2] In addition to the stored crop, Vernalis Warehouse owed the Partnership $69,000 on account from bean sales.

■ The Partnership presented testimony of general partner Robert Bogetti that the 1992 crop and proceeds were not property of the Partnership, but rather individual property of Robert Bogetti. Mr. Bogetti testified that he had hired the Partnership for the 1992 crop year to work as a "contract farm-er" only, and the Partnership had no interest in the crops. Bank offered evidence rebutting Mr. Bogetti's testimony including that the Partnership had made draws for 1992 crop production cost in February 1992 and that the Partnership had consistently been treated as sole owner of the crop in 1989, 1990, and 1991, and as debtor-in-possession in 1993. The court takes judicial notice of the schedules filed by the Partnership (submitted under penalty of perjury) that the Partnership owned the 1992 crop and crop proceeds. Although the schedules have not been formally amended consistent with Mr. Bogetti's testimony, the Partnership filed a declaration by Mr. Bogetti in connection with a cash collateral motion in February 1993 that the crop and crop proceeds were individual rather than Partnership property.

Bank relies on its security documents and evidence of Partnership ownership in the 1992 crop to assert a perfected security interest in *all* the Partnership's 1989, 1991, and 1992 bean crop and crop proceeds. The Partnership contests the Bank's assertions and argues that since the bean crop is now held as "inventory" rather than "crops" or "farm products," Bank's security agreement does not extend a security interest in any of the beans stored and held for sale with third parties. Alternatively, the Partnership contends that if Bank's security documents are sufficient to sustain a security interest in the stored beans, such security interest is limited to the crops harvested from the five parcels described in the security agreements. The Partnership additionally argues that none of the 1992 crop is subject to any security interest because it is individual property of Robert Bogetti.

### DISCUSSION

The nature, extent, and validity of Bank's security interest in Partnership property is governed by state law. *Butner v. United*

---

**1.** Bank amended its June 1990 financing statements twice—in July 1991 and November 1991. The July 1991 amendment amended item 6 to include rights to payment on a contract between debtor and Rhodes Bean and Supply Company. The November amendment was identical to the language in the June 1990 financing statement except that it added "general intangibles" where previously it provided only for "intangibles."

**2.** Evidence regarding the contractual relationship between the Vernalis Warehouse and the Partnership was not extensively developed or disputed.

*States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Resolving the dispute at hand requires the court to look to California law on contracts and the Uniform Commercial Code as adopted by the California Legislature. The ultimate questions are whether Bank has a security interest on the Partnership's beans and proceeds and whether such interest is perfected sufficient to defeat the section 544 "strong arm" powers of the debtor-in-possession to avoid unperfected interests. To resolve these questions requires the court to determine (1) what property Bank's security interest attached to, (2) whether Bank's security interest was properly perfected, and (3) if Bank had a perfected security interest, whether such interest continued to the date the Partnership filed bankruptcy.

*Attachment*

Section 9203 of the California Commercial Code sets forth the basic requirements for attachment and enforceability of security interests.

> [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless all of the following are applicable:
>
> (a) The collateral is in the possession the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned.
>
> (b) Value has been given.
>
> (c) The debtor has rights in the collateral.

Cal.Com. Code § 9203(1) (West 1990). Section 9203(2) continues to specify that absent contrary agreement "[a]ttachment occurs as soon as all of the events specified in subdivision (1) have taken place...." Cal.Com. Code § 9203(2) (West 1990).

The parties do not dispute whether value has been given, but do dispute the adequacy or interpretation of the collateral descrip-

tions and whether the Partnership had rights in certain of the claimed collateral. To determine what property is subject to Bank's security interest, the court will specifically address the issues raised concerning the language of the security agreements with reference to property of the Partnership estate existing at the time of execution of the security agreements.

1. 1991 Bean Crop from Five Parcels Identified in Security Agreements.

██ The security agreements provided a grant of security interest in "crops growing or to be grown." Consistent with the requirements of section 9203(1) that a security interest in crops growing or to be grown include a description of the land, descriptions of five Partnership farming parcels were referenced and attached to the security agreements.

Based on the clear language of the security agreements, Bank obtained an enforceable security interest on any crops that were growing or to be grown on the five identified properties from the date the first security agreement was executed in June 1990.[3] This category of goods indisputably includes the 1991 crop grown on the five described parcels.

██ The Partnership raises a curious argument that even though Bank's security interest may have attached to the 1991 crop from the five identified parcels, the security interest "unattached" when the crop was harvested and sent to Rhodes for cleaning, bagging, and marketing. The basis of the Partnership's argument is that once the beans were delivered to Rhodes, they became "inventory." Since Bank's security agreement did not include "inventory," the security interest is alleged to have been lost. The Partnership cites California Commercial Code provisions, code comments, and case law purporting to establish that once "farm product," such as a harvested crop, comes into the possession of a non-farmer for sale or marketing, it becomes inventory; and, unless the security agreement references in-

---

**3.** The second security agreement executed in August 1991 was duplicative as to growing crops or crops to be grown as the June 1990 security agreement would have already covered all crops to be grown on the identified parcels since date of execution.

ventory, no security agreement is created or retained in those goods.

■ The authority cited by the Partnership does not, however, support the argument advanced. There is no question that the 1991 bean crop was covered by the "growing crops or crops to be grown" language of the security agreements. That the beans later became "farm product" once severed from the land and may have become "inventory" when trucked to Rhodes for processing and sale does not affect attachment or enforceability of Bank's security interest. Security agreements are required to define the rights of the debtor and secured party in identified collateral. Once a security interest attaches to described collateral, subsequent transmutations as to classification under section 9109 do not defeat that security interest. The Partnership has cited .no relevant authority supporting its contention and ignores basic precepts of secured transactions that a security interest once attached to identified property continues in that property notwithstanding changes debtor's use of the property or even, in some circumstances, sale to third parties. *See, e.g.,* Cal.Com. Code § 9306 (West 1990) (a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof); Cal. Com. Code § 9401(3) (West 1990) (perfected security interest continues in goods notwithstanding change in debtor's use of collateral).

Based on the foregoing, the court determines that Bank's security agreements created a valid and enforceable security interest in the Partnership's 1991 bean crop from the five parcels described in the security agreements.

2. 1989 Bean Crop.

■ As the Partnership emphasized in its argument regarding the 1991 crop, the subclassifications of goods in section 9109 are mutually exclusive, and without proper identification, there can be neither an enforceable security interest nor perfection. *See* Cal. Com. Code § 9109 (West 1990) California Code and Uniform Code cmts. Bank's security agreement included "farm product," but did not include "inventory." Bank contends that the 1989 crop was "farm product" when

the security agreements were executed. The Partnership contends the 1989 crop was "inventory" and not subject to Bank's security interest.

The evidence at trial established that immediately upon harvest, the 1989 bean crop was trucked to Rhodes for cleaning, bagging, and marketing. Thus, at the time the security agreements were executed in June 1990 and August 1991, the 1989 beans had already been harvested and were stored at Rhodes.

For harvested crops to be classified as "farm products," they must be "in the possession of a debtor engaged in raising, fattening, grazing or other farming operations." Cal.Com. Code § 9109(3) (West 1990). The code comments are specific that when crops come into the possession of a third party for marketing or sale, the crops cease to be "farm products" and become "inventory."

> When crops or livestock or their products come into the possession of a person not engaged in farming operations they cease to be "farm products." If they come into the possession of a marketing agency for sale or distribution or a manufacturer or processor as raw materials, they become inventory.

Cal.Com. Code § 9109 (West 1990) Uniform Code cmt. 4.

■ Notwithstanding the clear language of the code and comments, a split of authority has developed that certain degrees of constructive possession where crops are stored with third parties for sale may satisfy the possession requirement to cause harvested crops held by a third party for sale to remain "farm products." California courts have not addressed this issue, and Bank urges the court to adopt the analysis of the court in *In re Roberts,* 38 B.R. 128 (Bankr.D.Kan.1984), which appears to be the seminal case developing this split. Similar to this case, the farmer in *Roberts* harvested his grain crop and stored it with an independent storage facility. The court first noted that "possession" was not a term defined in the code. The court then cited several commentators supporting a final conclusion that as long as the farmer has some indicia of ownership such as a negotiable or non-negotiable receipt for the stored

crops,˙ the crops remained in the farmer's possession and could continue to be classified as "farm products."

This court cannot accept the *Roberts* court's analysis. First, the facts are distinguishable or incomplete in an important respect. In *Roberts,* it was either unclear or a fact that the storage facility did not market the farmer's grain. In this case, there is no question that the Partnership's agreement with Rhodes includes a duty on Rhodes' part to market and sell the beans. Second, although "possession" is not a defined term, the comments strongly suggest that "possession" means actual possession. Uniform comment 4 quoted above states that crops become "inventory" when they come into possession of a marketing agency for sale. Use of the word marketing agency *assumes* constructive possession and ownership of the farmer. Finally, the court feels strongly that certainty is fostered by interpreting language literally. Accepting "constructive possession" as "possession" would add an undesired "gray" area in determining goods classifications which are routinely relied upon by debtors and creditors to be mutually exclusive. These terms should be given plain "black and white" meanings to the extent possible.

Based on the foregoing, the court determines that Bank's security agreements did not create a security interest in any of the Partnership's 1989 crop currently stored at Rhodes or Vernalis Warehouse.

3. 1991 Bean Crop from Eight Parcels not Described in the Security Agreements.

Bank concedes that attachment or perfection of a security interest in growing crops or crops to be grown requires descriptions of the real property to be attached to the security agreement. Bank also concedes that when the August 1991 security agreement was executed, all of the Partnership's 1991 crop was yet to be harvested. Notwithstanding, Bank contends to have a security interest in the entire 1991 crop based on having rights to "after-acquired farm products." Bank asserts that when the 1991 crop was severed from the ground in the harvest, it became "farm product" and Bank's security interest attached.

Bank urges this court to determine its security interest in after-acquired farm products based on two grounds. First, Bank emphasizes that the financing statement filed in June 1990 contained an explicit reference to after-acquired farm products. This financing statement also contained language granting a security interest and was signed by partners of the Partnership. Accordingly, Bank claims that all requirements for a valid security agreement were met, and the financing statement should be determined to have expanded the security interest to include after-acquired farm products. Second, Bank argues that the granting language in the security agreements should be construed to include after-acquired farm products because they referenced "all farm products of whatsoever kind or nature."

a. Financing statement expanding security interest.

Contrary to Bank's argument that the June 1990 financing statement expanded the scope of its security interest set forth in the security agreement, a financing statement is overwhelmingly held ineffective to expand the collateral described in a security agreement. Courts following this general rule typically offer similar rationales—two of which repeatedly appear.

The first rationale concerns differences between the function and purpose of a security interest and that of a financing statement. A security agreement is an agreement describing the property in which the debtor has conveyed a security interest to the creditor. The code comments emphasize that it is in the nature of a statute of frauds designed to establish whether a security interest in fact exists and its scope or extent. Cal.Com. Code § 9203 (West 1990) Uniform cmt. 5. By contrast, a financing statement is not designed to define or create contractual rights and is merely a notice and perfection tool. A financing statement is publicly filed. It perfects a creditor's interest vis-a-vis subsequent lien creditors and allows interested parties to obtain fuller information before entering into transactions

with the debtor. The description of collateral in a financing statement may be, and is often, more expansive than the security agreement to ensure that perfection and notice is unquestioned in the collateral specifically described in the security agreement.[4] Accordingly, where disputes arise as to what collateral is covered by a security interest, courts limit their inquiry to what is described in the security agreement even though the financing statement may describe additional collateral. *See, e.g., Northwest Acceptance Corp. v. Lynnwood Equipment, Inc.*, 841 F.2d 918, 921 (9th Cir.1988) (security agreement rather than financing statement defined extent of security interest); *In re Martin Grinding & Machine Works, Inc.*, 793 F.2d 592 (7th Cir.1986) (broader description of collateral in a financing statement is ineffective to extend a security interest beyond that stated in the security agreement).

 The second recurring rationale is that a financing statement is generally not intended to be a security agreement and, as a result, usually lacks intent or granting language sufficient to create a security interest. Without this specific intent shown by language granting a security interest, the financing statement is simply ineffective to create one. *See, e.g., Shelton v. Erwin*, 472 F.2d 1118 (8th Cir.1973) (financing statement is merely evidence of creation of a security agreement and is usually not itself a security agreement); *In re John Oliver Co.*, 129 B.R. 1 (Bankr.D.N.H.1991) (statement "to cover my interest up to $250,000.00" in financing statement was insufficient to create security interest); *In re Mack*, 93 B.R. 695 (Bankr. D.N.D.1988) (security agreement giving creditor security interest in growing crops was unenforceable for lack of land description even though financing statement contained statutorily sufficient description).

Bank would have the court ignore the first rationale described above and determine, with respect to the second, that the language in the financing statement was sufficient to create a security interest. The court is unwilling to do either.

The secured loan between Bank and the Partnership was documented in a standard manner with three documents signed by the Partnership: a revolving note, a security agreement, and a financing statement. Each of these documents was clearly identified on its face, and there was clearly no question as to what the parties intended by each one. The Partnership and, especially, Bank knew the purpose and function of each of these documents. With the purposes of these documents in mind, the Partnership and Bank would have looked exclusively to the security agreement to define Bank's collateral. In addition, while Bank would be extremely interested in crafting the collateral description in the financing statement to preserve its rights vis-a-vis other lien creditors, the Partnership would have little incentive to review it carefully.[5] Where a transaction contains such standard documentation, the court is extremely unwilling to determine that an otherwise complete and unambiguous security agreement was intended by the parties to be supplemented or corrected by a financing statement that "re-granted" an additional security interest.

Additionally, the court is not persuaded that the language asserted by Bank to have granted a security interest actually does so. The printed language relied on by Bank provides as follows:

> This FINANCING STATEMENT covers the following types or items of property in which Debtor grants to Secured Party a security interest.

In this sentence, the purported granting language appears to be a mere "tag on" to clarify that debtor *has granted* a security interest in the property, not that the debtor is presently granting a security interest. Contrasted to the language clearly intended to create a security interest in the security

---

4. Section 9203(1) requires a security agreement to contain a "description of the collateral" while section 9402(1) merely requires the financing statement "to contain a statement indicating the types, or describing the items of collateral."

5. The only reason a debtor would have substantial concern about a collateral description in a financing statement would be the chilling effect an overbroad statement may have in obtaining future credit.

agreements, this purported granting language pales.

> As security for the payment by ROBERT BOGETTI AND SONS, A PARTNERSHIP ("Borrower") to SECURITY PACIFIC NATIONAL BANK ("Bank") of a Promissory Note executed by Borrower in favor of Bank, dated June 5, 1990, for $1,700,000.00 ... *Borrower hereby grants to Bank a security interest in the following "Collateral"....*

(emphasis added).

The court concedes, however, that Bank's argument may have some merit had there not been a contemporaneously executed security agreement. Several courts have liberally construed less than clear granting language in a financing statement to create a security interest where there is no formal security agreement between the parties. *See, e.g., Morey Machinery Co., Inc. v. Great Western Industrial Machinery Co.,* 507 F.2d 987 (5th Cir.1975) (financing statement with the words "Secured hereby" stamped on top of it was sufficient to create a security agreement); *Little v. County of Orange,* 31 N.C.App. 495, 229 S.E.2d 823 (1976) (as long as writing contains language which makes and evidences bargain, it does not matter that it is not denominated a security agreement). This authority should, however, be strictly limited to the factual context in which all of the cases found by the court arose—namely, where there was no formal security agreement, and the secured party was struggling on the basis of one or more contract theories to establish a security interest using the financing statement as written evidence of a security agreement.

b. "All farm products" language.

 Section 9204 provides that a security agreement may provide for a security interest in after-acquired collateral. Unless specifically provided for, however, a security interest attaches only to the collateral described and in existence at the time the security agreement is executed.

 As discussed above, the security agreements did not include a clause describing after-acquired farm products. Nevertheless, Bank contends the language of the secu-

rity agreements providing for a grant of a security interest in "[a]ll farm products of whatsoever kind or nature" created a security agreement in after-acquired farm products. Bank relies on a well-developed line of authority that where a security agreement provides for a security interest in "all inventory" or "all accounts" or similar broad language, the security interest includes after-acquired inventory and accounts.

Bank has, however, cited no case extending this line of authority beyond inventory and accounts receivable. As emphasized recently by the Ninth Circuit in *Stoumbos v. Kilimnik,* 988 F.2d 949 (9th Cir.1993), this line of authority is based on the assumption that the parties realize that inventory and accounts receivable are in a constant state of turnover and "no creditor could reasonably agree to be secured by collateral that would vanish in a short time in the normal course of business." *Id.* at 955. In *Stoumbos,* the court refused to extend this line of authority to a security interest in "equipment" which it determined was not a category of goods subject to constant turnover.

"Farm products" is a broad subcategory of goods which includes crops, livestock, and supplies used or produced in farming operations. Cal.Com. Code § 9109(3) (West 1990). Although there are conceivably some items included in "farm products" that may, like inventory or accounts receivable, "vanish" and be replaced in a short period of time in the normal course of business, such turnover has not been shown by Bank to be so constant that a creditor would reasonably expect to secured by after-acquired farm products. Indeed, some farm products, such as livestock, may remain in the farmer's possession for substantial periods without replacement. Accordingly, the court is not willing to extend the line of authority cited by Bank to include "farm products."

Based on the foregoing, Bank has no security interest in the 1991 bean crop or crop proceeds from the eight parcels not identified in the security agreements.

4. 1992 Crop and Crop Proceeds.

 The Partnership takes a rare position for a debtor-in-possession that certain

property is *not* property of the estate—namely, the 1992 bean crop and proceeds. This position is less shocking, however, since the Partnership is alleging that the crop is the personal property of general partner Robert Bogetti.

The Partnership submitted no documentary evidence supporting its contentions, and the *only* evidence was the testimony of Robert Bogetti. Mr. Bogetti testified to the effect that, in 1992, he individually owned the crop on all thirteen parcels previously farmed by the Partnership. He further testified that he hired the Partnership to "custom farm" the 1992 crop. This testimony, however, is not credible.

The Partnership had farmed the parcels in question in 1989, 1990, 1991, and 1992, and continues to farm the parcels in 1993 as debtor-in-possession. For each of these years, except 1992, the Partnership claims to own the bean crop. No business reason is given for the change in ownership of the crop where the Partnership continued to farm the parcels, and Mr. Bogetti merely claims that he decided to own the crops for 1992 and hire the Partnership as a contract farmer. The only reason the court can infer for Mr. Bogetti's decision is that Mr. Bogetti and the Partnership are seeking to defeat Partnership lien claimants. This inference is supported by credible evidence that the Partnership does indeed own the 1992 bean crop.

First, the Partnership's schedules as originally filed show the Partnership as owning the 1992 crop subject to Bank's security interest. The Partnership's bankruptcy petition was filed on or about December 16, 1992. The only schedules ever filed in the case were dated January 29, 1993, and filed together with a verified amendment to the creditor matrix and a verified schedule of current income and current expenditures. The schedules have never been amended. Attached to the schedules was a financial statement dated November 30, 1992, showing as assets unsold harvested crops worth $1,494,968.00. Included in that sum are crops from 1989, 1991, and *1992*. The amount shown for 1992 is $411,390.00.

Second, the Partnership filed a declaration of Robert Bogetti which contained an Exhibit A further admitting that at least some of the 1992 crop was subject to the Bank lien. Although this declaration was later contradicted by a supplemental declaration of Mr. Bogetti that he owned none of the 1992 crop, the court considers the declaration, like Mr. Bogetti's current testimony to be suspect.

Finally, the Bank introduced bank statements showing that the Partnership drew funds on its revolving credit line in February 1992 for 1992 crop financing. As a contract farmer, the Partnership would have had no legitimate reason or purpose to draw funds for crop financing unless it *owned* the 1992 crop.

Having reviewed the documents hereinabove referred to, and having heard the testimony and observed the demeanor of Mr. Robert Bogetti, and having weighed all of the other evidence, the court finds and concludes that the 1992 crop and the proceeds thereof are assets of the Partnership's estate and not the property of Robert Bogetti individually. The treatment to be accorded the liens of the Bank regarding the 1992 crop is the same as that accorded Bank liens as to the 1991 crop.

*Perfection*

■ Even though Bank's security interest has attached as previously described, Bank must have an adequate and properly filed security interest to defeat the debtor-in-possession's section 544 "strong arm" powers. In this case, the Partnership does not challenge Bank's financing statements as to adequacy or place of filing. The Partnership does, however, appear to challenge the continuing validity of Bank's perfection based on changes in the classification of the goods covered by the security agreements after Bank's security interest attached—specifically from crops and farm products, which was covered by Bank's security agreement, to inventory, which was not.

The California Commercial Code appears to directly address this issue and indicates that a properly perfected security interest continues in goods notwithstanding the fact that the debtor's use of the goods (and consequently its classification under the code) changes.

A filing which is made in the proper place in this state continues effective even though the debtor's residence or place of business or the location of the collateral *or its use*, whichever controlled the original filing, is thereafter changed.

Cal.Com. Code § 9401(3) (West 1990) (emphasis added).

In addition, even though ignoring section 9401(3), the court in *Robbins v. Production Credit Ass'n (In re Walkington)*, 62 B.R. 989 (Bankr.W.D.Mich.1986), recognized the policy of the Uniform Commercial Code that perfected security interests should not be defeated merely because the debtor's use of the goods and the goods characterization under the code changes.

Based on the foregoing, the court determines that Bank's security interest remained perfected in the Partnership's bean crop notwithstanding any classification changes subsequent to attachment of Bank's security interest.

### CONCLUSION

Counsel for the Partnership is directed to prepare findings of fact, conclusion of law, and judgment consistent with the above memorandum decision. These documents shall be served on opposing counsel. Absent objection after 10 days, the order shall be signed and entered.