**In re Sarbjit Singh THIARA, Debtor.**

**Sarbjit Singh Thiara, Appellant,**

**v.**

**Spycher Brothers, a California general partnership, Appellee.**

**BAP No. EC–01–1359–MAPB.
Bankruptcy No. 00–25481.
Adversary No. 00–2394.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted March 21, 2002.

Filed Nov. 1, 2002.

Thomas A. Willoughby, Felderstein, Willoughby & Pascuzzi, Sacramento, CA, for Sarbjit Singh Thiara.

Walter J. Schmidt, Crabtree, Schmidt, Zeff, Jacobs & Farrer, Modesto, CA, for Spycher Brothers.

Before: MARLAR, PERRIS and BRANDT, Bankruptcy Judges.

## OPINION

MARLAR, Bankruptcy Judge.

### INTRODUCTION

The debtor/farmer obtained crop financing under the false pretense and misrepresentation that he would repay the shortfall for a 1998 crop advance as well as any new advances for the 1999 crop. He then converted insurance proceeds for the damaged 1999 crop, and refused to pay the shortfall. Because of supervening binding authority, we VACATE the judgment that the conversion liability is nondischargeable and REMAND, while (in an unpublished companion memorandum) AFFIRMING the nondischargeability of part of the debt based on fraud.

### *FACTS*

Sarbjit Singh Thiara ("Debtor") farms almonds on a 500–acre ranch.[1] Spycher Brothers ("SB") is involved in the almond industry, and its business includes crop financing. Debtor and SB had, over many years, a "history ... of honorable dealings" with each other. (Transcript, Court's Findings, July 3, 2001, at 21:7–12.)

In May 1998, Debtor obtained a "crop advance" loan from SB in the amount of $576,000 ("1998 advance"). In connection with that advance, Debtor executed a three-year Almond Purchase Agreement

1. Apparently, Debtor has since lost this real property through foreclosure.

("Agreement"), whereby he agreed to sell SB his entire almond crop for 1998, 1999 and 2000. SB agreed to process and sell the crop and pay Debtor any excess profit. However, the Agreement gave Debtor the right to decide when the crop would be sold, provided that he consented to the sale price for each year's crop and designated a date no later than April 1st of the year following the fall harvest. Any sale proceeds were to be credited against Debtor's loan, and the repayment terms of the Agreement would be extended as necessary.[2] To secure the loan, SB obtained and perfected a security interest in Debtor's ranch, crops, and crop proceeds.

Debtor delivered his 1998 crop to SB, but the crop was not sold until March 1999. In the interval, almond prices had fallen. This resulted in a shortfall of $321,111 on the 1998 Agreement. SB maintained that the shortfall resulted from Debtor's delay in consenting to a sale. Debtor denied having given his consent, or alternatively, denied that his consent was required.

Pursuant to the Agreement, the shortfall was carried forward to the 1999 crop year. Unfortunately, there was a winter frost which destroyed most of the 1999 crop, and Debtor became "desperate for money." Transcript, June 27, 2001, at 99:26–100:1–4.

In April 1999, Debtor met with Roger Nunes ("Nunes"), general manager of SB,

and SB's general partner, Hartley Spycher ("Spycher"). At that time, Debtor requested an additional advance for the 1999 crop and for "cultural" or orchard maintenance expenses. Nunes testified that Debtor assured him that he would repay the entire debt. However, Debtor testified that he had only intended to repay the 1999 advance but not the 1998 shortfall. In any event, Debtor did not communicate that intention to SB, and SB agreed to finance an additional $500,000, which sum included the 1998 shortfall as well as new advances for 1999. The actual additional advances were approximately $100,000.

In connection with the May, 1999 advance, Debtor executed new loan documents, including a promissory note for $500,000.[3] The note provided:

> All sums advanced or accruing under this Promissory Note are payable from sales proceeds of Borrower's almond crop to SPYCHER BROTHERS and are due when and as said sales proceeds are payable. In the event said crop sales proceeds are insufficient said sums shall become due and payable upon demand.

Promissory Note, dated May 26, 1999.

Debtor also signed a security agreement, giving SB a security interest in

> [a]ll farm products, including but not limited to all crops growing or to be grown, all inventory, accounts, chattel

---

**2.** Paragraph 8 of the Agreement provided for an extension of the Agreement's terms based on any outstanding debt:

> 8. In the event that Grower is obligated to S.B. for advance payments, loans, or other indebtness [sic], after S.B. has made final settlement for Grower's then current crop of almonds, it is mutually agreed, that the terms of this agreement shall continue for so many future years as are necessary to allow S.B. to recoup from Grower's crop proceeds Grower's full obligation plus interest at the legal

> rate. This right of recovery shall be additional to all other remedies at law.

Almond Purchase Agreement, dated May 13, 1998.

**3.** Apparently, another Almond Purchase Agreement was entered into whereby the crop would be "pooled" with those of other farmers, thereby giving SB control over the sale. However, the 1999 agreement, if any, was not introduced at trial, and is not in the excerpts of record.

paper, and general intangibles now owned or hereafter acquired with respect to that certain real property more particularly described in Exhibit "A" attached hereto and made part of.

Security Agreement, referencing Promissory Note dated May 26, 1999.

An amended UCC–2 financing statement was filed with the Secretary of State on June 1, 1999. It was undisputed that these documents gave SB a valid and perfected security interest ("Security Interest") in crop loss insurance proceeds for the 1999 crop, although Debtor later challenged whether the Security Interest extended to insurance proceeds paid for damaged but unharvested crops.

As further security for the loan, Debtor executed an Application for Assignment of Indemnity ("Assignment") to SB of all of his rights and interest in insurance indemnity payments for any crop loss claim on the entire 1999 crop. The Assignment stated that the insurance company would determine who was entitled to the indemnity payments, and would then make payment by joint check.

At the end of May, 1999, SB gave Debtor the first cash advance of $78,889. Sometime between April and July, 1999, Debtor filed an insurance claim and settled with the insurance company for the damaged 1999 crop. In July 1999, Debtor received a check from the insurance company, payable only to him, for $452,212. Debtor did not disclose to SB, either at the April 1999 meeting or the May 1999 loan

transaction, that he had made an insurance claim or that he had received the check. Debtor then spent this money, allegedly on farm expenses, and did not pay any portion thereof to SB. SB learned about the insurance proceeds in August 1999, and thereafter sought to collect the loan debt. Debtor then made a $50,000 payment.[4]

As part of the 1999 advance, SB also charged Debtor $24,000 in order to harvest what crop there was, which Nunes described as being in "terrible condition." The bankruptcy court found that the balance due on Debtor's $500,000 note, as of July, 2001, including legal fees and interest, was $402,499.78.

### Proceedings in Bankruptcy

Debtor filed a voluntary chapter 11[5] petition on May 9, 2000. SB filed a timely complaint to determine the nondischargeability of its debt, and filed a motion for summary judgment. SB alleged that Debtor had obtained the advances from SB through fraud, false representation, or false pretenses (§ 523(a)(2)(A)), and that he had willfully and maliciously injured it by converting the insurance proceeds (§ 523(a)(6)). SB also alleged that Debtor had committed fiduciary fraud or defalcation (§ 523(a)(4)).

Debtor opposed the motion for summary judgment and filed a "counter-motion," which was essentially an objection to SB's claim.[6] A combined hearing on the motions and trial was then conducted.

---

**4.** Debtor repaid SB $50,000 on September 3, 1999. Apparently, this was accomplished with his brother's financial assistance. Debtor's brother is also an almond farmer.

**5.** Unless otherwise indicated, chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

**6.** In his papers, and in this appeal, Debtor raised the issue that SB's lien in the insurance proceeds as well as the Assignment were avoidable fraudulent transfers. At trial, the bankruptcy court made it clear that the fraudulent transfer issue was beyond the scope of the § 523 proceeding and concerned the Debtor's claim objection. It denied such objection without prejudice to refiling. We decline to review this matter, which may involve

Spycher, Nunes and Debtor testified at the trial.[7] The pertinent testimony focused on three areas: (1) the sale of the 1998 crop, which resulted in the shortfall; (2) the parties' intentions when entering into the renewal loan transaction in April 1999; and (3) SB's rights in the 1999 crop insurance proceeds.

On July 3, 2001, the bankruptcy court orally announced its findings and conclusions. *See* Fed. R. Bankr.P. 7052, incorporating Fed.R.Civ.P. 52(a). The court found that Debtor knew that the 1999 transaction included the 1998 shortfall amount, but that he did not intend to pay that amount and deliberately kept such intention secret. It found that SB justifiably relied on Debtor's representation that he would pay the entire amount represented by the 1999 renewed financing, and that SB was proximately damaged in the sum of the 1999 advances. The court found that the damages proximately caused by the misrepresentation were the new loan advances, totaling approximately $100,000, made by SB on or after May 26, 1999, and determined that portion of the debt nondischargeable under § 523(a)(2)(A).

The bankruptcy court further found that SB had a Security Interest in both the growing crops and the crop insurance proceeds. Alternatively, it determined that there was a valid and enforceable Assignment of such proceeds to SB from Debtor.[8]

The court also determined that Debtor converted the insurance proceeds, and such conversion was a willful and malicious injury. Therefore, the court held that the entire debt of $402,499.78 was nondischargeable under § 523(a)(6).

The court did not resolve the § 523(a)(4) count, having ruled in SB's favor on other grounds. Nevertheless, Debtor has raised issues concerning the § 523(a)(4) count. We decline to reach the issue whether the debt was also nondischargeable under § 523(a)(4) as it is unnecessary to the disposition of this case, because the trial court, considering it moot, did not resolve this count, and because no cross-appeal was filed by SB. *Compare Diamond v. Kolcum (In re Diamond)*, 285 F.3d 822, 826 n. 1 and 828 n. 2 (9th Cir.2002) (Ninth Circuit reviewed the merits of an alternative count resolved in bankruptcy court's summary judgment).

Judgment in favor of SB was entered on July 9, 2001, and Debtor timely appealed.

### ISSUE [9]

Whether the bankruptcy court correctly determined that Debtor converted the crop insurance proceeds, and that such conversion was a "willful and malicious" injury nondischargeable under § 523(a)(6).

### STANDARDS OF REVIEW

■ Because the bankruptcy court entered its judgment after trial, we review

---

factual issues beyond the record on appeal, and which was not first addressed by the bankruptcy court. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir.1998).

7. In addition, the parties stipulated to admit Debtor's deposition and declaration evidence, as the court considered the trial and summary judgment proceedings to be "one ball of wax." Transcript, June 27, 2001, at 7:5–6; 104:15–17,25. Regardless, the matter was a trial, partly on written evidence and partly through live witnesses.

8. Because of the court's finding, the parties have raised factual and legal issues concerning the Assignment. Because we resolve this appeal on the basis of SB's Security Interest, we do not reach the alternate theory that the Assignment independently supported the conversion judgment.

9. The parties have raised other issues, the dispositions of which do not warrant publication under 9th Cir. BAP Rule 8013–1; we address those issues in a companion memorandum.

the bankruptcy court's findings of fact for clear error, and its conclusions of law *de novo.* *Carrillo v. Su (In re Su),* 290 F.3d 1140, 1142 (9th Cir.2002). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (citation omitted). On appeal, the reviewing court shall give "due regard ... to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr.P. 8013. This deference is also given to inferences drawn by the trial court. *Beech Aircraft Corp. v. United States,* 51 F.3d 834, 838 (9th Cir.1995).

 The bankruptcy court's conclusions of law regarding nondischargeability, as well as its interpretation of state law, are reviewed *de novo.* *Lin v. Ehrle (In re Ehrle),* 189 B.R. 771, 774 (9th Cir. BAP 1995). Additionally, we review *de novo* the bankruptcy court's application of the legal standard in determining whether a debt resulting from conversion is dischargeable as a willful and malicious injury. *See Rifino v. United States (In re Rifino),* 245 F.3d 1083, 1087 (9th Cir.2001) (as amended).

### DISCUSSION

### (A) Section 523(a)(6)

 The bankruptcy court determined that Debtor converted the crop insurance proceeds and, thus, because the amount of the converted insurance proceeds exceeded the remaining debt, excepted the entire debt from discharge as a "willful and malicious injury." 11 U.S.C. § 523(a)(6). Under § 523(a)(6), the injury must be "willful," such that the debtor must have intended the consequences of his action, and not just the action itself. *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). "The willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury or that the debtor believed that injury was substantially certain to occur as a result of his conduct." *Petralia v. Jercich (In re Jercich),* 238 F.3d 1202, 1208 (9th Cir.2001), *cert. denied,* 533 U.S. 930, 121 S.Ct. 2552, 150 L.Ed.2d 718 (2001). Thus, negligent or reckless acts which inflict consequential injury do not fall within the ambit of § 523(a)(6). *Geiger,* 523 U.S. at 64, 118 S.Ct. 974.

 In addition, the injury must be "malicious." This means that it must also be a wrongful act, done intentionally, which necessarily causes injury, and which is done without just cause or excuse. *Jercich,* 238 F.3d at 1208. Whether an injury is "malicious" requires a separate inquiry, which is reviewed for clear error. *Id.* at 1209 & n. 36; *Su v. Carrillo (In re Su),* 259 B.R. 909, 914 (9th Cir. BAP 2001), *aff'd,* 290 F.3d 1140 (9th Cir.2002).

### (B) Conversion Under State Law

 Although federal law determines the nondischargeability of a debt, state law governs the elements of a conversion respecting property. *Jercich,* 238 F.3d at 1206 n. 16. In California, "[t]he elements of a conversion are the creditor's ownership or right to possession of the property at the time of the conversion; the debtor's conversion by a wrongful act or disposition of property rights; and damages." *Farmers Ins. Exchange v. Zerin,* 53 Cal.App.4th 445, 451, 61 Cal.Rptr.2d 707, 709 (1997).

Thus, the first element to be determined in the instant case is whether SB had a legal interest in the insurance proceeds by virtue of its Security Interest. Debtor

contends that there was no demand for payment upon default, nor was there an agreement that Debtor should turn over any insurance proceeds. Thus, he argues that SB had no immediate right to possession or control.

■ Debtor misinterprets the law. In California, "a lien constitutes a property interest which may be converted." *Id.* (citing *Weiss v. Marcus*, 51 Cal.App.3d 590, 124 Cal.Rptr. 297 (1975)). Thus, one who wrongfully withholds personal property from one who is entitled to it under a security agreement may be liable for conversion. *Del Bino v. Bailey (In re Bailey)*, 197 F.3d 997, 1000 (9th Cir.1999) (citing *Messerall v. Fulwider*, 199 Cal. App.3d 1324, 1329, 245 Cal.Rptr. 548, 550 (1988)). SB's lien interest thus gave it a legal basis to maintain that Debtor's conduct was a conversion of its collateral.

■ Debtor rejoins that, since he obtained the insurance check while the damaged 1999 crop was still unharvested, SB's Security Interest was only in the real property and was therefore excluded from the provisions of the California Uniform Commercial Code. *See Ehrle*, 189 B.R. at 775 (recognizing exception to commercial code for sale proceeds of real property encumbered by lien). *See also* former Cal.

Comm.Code § 9104(j), now § 9109(d)(11)[10] (providing that the Commercial Code's secured transactions provisions do not apply "to the creation or transfer of an interest in or lien on real estate.").

Debtor's argument that the 1999 crops were realty is unpersuasive. In California, "[f]or some purposes growing crops are regarded as part of the realty upon which they are growing, while for other purposes they are regarded as personalty." *Carey v. Glenco Citrus Prods.*, 235 Cal.App.2d 572, 578, 45 Cal.Rptr. 365 (1965).

The cases cited by Debtor are distinguishable from our facts. *Carey* concerned the sale of growing crops by a lessee of a farm, and did not involve a security interest.[11] *Ehrle* dealt with a contract for sale of real property. *See also Wilson v. White*, 161 Cal. 453, 460, 119 P. 895 (1911) (written contract for sale of land included crops as part of realty).

Here, SB held a Security Interest in the crops and their proceeds, and in any crop insurance proceeds. *See* former Cal. Com. Code § 9306(1), now Cal. Com.Code § 9102. Moreover, the Commercial Code defines crops as "goods" rather than realty. *See* Cal. Com.Code former § 9019 (current § 9102).[12] Once a security inter-

---

**10.** The events in question occurred before the California Commercial Code was substantially amended effective July 1, 2001.

**11.** Even though growing crops may be considered to be real property, nevertheless, crops can be "constructively severed" and thus become personal property. That is what happened in *Carey*, where, in an action to quiet title to the land and crop, the court found that the termination of the lease changed the nature of the crop to personalty, which had been legally sold by the lessee to a buyer. *Id.*, 235 Cal.App.2d at 580–81, 45 Cal.Rptr. 365. *See also* 6 Harry D. Miller & Marvin B. Starr, *Cal. Real Estate* § 17.32 (3d ed.2000). Assuming, *arguendo*, that real property law applied to our facts, a constructive

severance occurred, because the insurance company could not have paid for damaged crops unless they were unfit for either growing or harvesting. The crops were the insured property, not the realty, and once damaged, it became immaterial whether they were severed or severable.

**12.** Historically, a security interest in crops was distinguishable from real property security interests or mortgages. Before the current Commercial Code, growing crops, like personal property, were collateral for "chattel mortgages." *See* former Cal. Civ.Code § 2955 et seq. (repealed in 1965). *See also Simpson v. Ferguson*, 112 Cal. 180, 184, 44 P. 484 (1896) (stating that the legislature intended to provide an exclusive mode for the mort-

est attaches to described collateral, subsequent transmutations or differences in classification do not defeat that interest. *See Robert Bogetti & Sons v. Bank of America (In re Robert Bogetti & Sons),* 162 B.R. 289, 294 (Bankr.E.D.Cal.1993) (fact that bean crop later became stored-bean inventory did not affect the bank's security interest).

Here, the insurance proceeds flowed from the damaged crops. SB's right to the proceeds had already attached and was therefore enforceable at the time Debtor received the insurance payment. *See* former Cal. Com.Code § 9203 (superseded by current § 9203). Merely because the damaged crops were still physically attached to the real property at the time the insurance company recognized the claim and paid it did not destroy SB's Security Interest in the insurance proceeds.

Debtor also cites *Del E. Webb Corp. v. Structural Materials Co.,* 123 Cal.App.3d 593, 176 Cal.Rptr. 824 (1981) as authority that cashing a joint check was not conversion because the plaintiff did not have the right to immediate possession or payment at the time the joint check was received by the defendant. *Id.,* 123 Cal.App.3d at 611, 176 Cal.Rptr. 824. That case is inapposite and did not involve a security interest. It concerned a check issued by plaintiff contractor jointly to the subcontractor and materials supplier. When the subcontractor failed to furnish all of the required materials, the contractor sued the supplier for conversion of the check. The court denied the contractor's conversion action on the ground that it did not have any title to, or possession of, the materials, which were to be delivered in the future. *Id.,* 123 Cal.App.3d at 610–611, 176 Cal.Rptr. 824. This case is also not applicable here, because no joint check was cut—only the Debtor's name was on it.

gaging of growing crops and that they should

In summary, the bankruptcy court did not err in determining that Debtor converted SB's property when he failed to turn over the crop insurance proceeds, and instead used them for his own purposes.

### (C) Conversion as a "Willful and Malicious" Injury

 Even though a conversion occurred, SB still had to prove that Debtor converted the proceeds with "wrongful intent." *Peklar v. Ikerd (In re Peklar),* 260 F.3d 1035, 1037–39 (9th Cir.2001). A conversion, under California law, establishes the debtor's "wrongful exercise of dominion over the personal property of another," but it "does not necessarily decide the type of wrongful intent on the part of the debtor that is necessary for the damages to be a nondischargeable debt under § 523(a)(6)." *Id.* (citing *Taylor v. Forte Hotels Int'l,* 235 Cal.App.3d 1119, 1124, 1 Cal.Rptr.2d 189 (1991)). The court must also find that the conversion was intentional, as defined in *Geiger* and its progeny. *Geiger,* 523 U.S. at 61–64, 118 S.Ct. 974.

Debtor maintains that the bankruptcy court committed reversible error because it relied on *Impulsora Del Territorio Sur, S.A. v. Cecchini (In re Cecchini),* 780 F.2d 1440 (1986), a Ninth Circuit opinion whose definition of "willfulness," as not requiring proof of a specific intent to injure, was effectively overruled by *Geiger.* The bankruptcy court in the case at bar opined:

The argument is often made that *Geiger* preempted the field on all concepts of intent with respect to Section 523(a)(6). There is, however, a substantial line of authority to the contrary, that there are other forms of intent, particularly in the business and finance area. And specifically, the old Ninth Circuit

be regarded as chattels).

case, *Cecchini* ... which then was subsequently dealt with and clarified in the Ninth Circuit decision of *Littleton*,[13] continues to have vitality.

*Cecchini* was a case where an entity within the United States who was, in effect, acting as an agent for an entity in Mexico in, I believe it was the apparel industry, received funds that were supposed to be forwarded to the Mexican entity and contending that they were owed some of the money, held onto the funds without substantial right in law.

And the Ninth Circuit held that the conduct was so wrong that the intent naturally followed from the nature of the conduct. As subsequently clarified in the *Littleton* case, what that really means is that there is some conduct that is so contrary to the rights of the third party and that is so certain to harm the rights of the third party that if one can show that the conduct was intentional then it follows that the trier of fact may infer without any other evidence that the conduct injury [sic] was not only willful but that it was malicious.

[Sic] An analogy to what is known in the tort field as res ipsa loquitur.[14] In this instance the $452,212 that [Debtor] came into possession of came into his possession at a point [sic] he executed an assignment [sic] he knew there was a financing statement, he knew that he owed $321,111 from the prior crop year, he had agreed to repay it and had formerly agreed to repay and he had secretly formed the intention not to repay. And given that, he did not tell [SB], he went ahead and cashed the check.... The short of it is that I believe this falls

within the Cecchini analysis and thereafter the debt is non-dischargeable under Section 523(a)(6).

Transcript, July 3, 2001, at 17:11–19:3 (footnote inserted).

The difficulty in resolving this issue lies in how to apply *Geiger*—a negligent medical malpractice case, to a conversion situation. In examining former law, the Supreme Court, in *Geiger*, mentioned the tort of conversion, and noted that there is a distinction between dischargeable conversions (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934)) and those which are excepted from discharge (citing *McIntyre v. Kavanaugh*, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916)). *Geiger*, 523 U.S. at 63–64, 118 S.Ct. 974.

■ Essentially, for a conversion to be dischargeable it must be done innocently in the honest but mistaken belief that authority to sell or use the collateral exists, which the Court labeled a "technical" conversion. *Davis*, 293 U.S. at 332, 55 S.Ct. 151.

Before *Geiger*, when a conversion was done intentionally with "[a] willful disregard of what one knows to be his duty, [is] an act which is against good morals and [is] wrongful in and of itself, and [is an act] which necessarily causes injury," that conversion satisfied the "willful and malicious" requirement of § 523(a)(6). *McIntyre*, 242 U.S. at 141–42, 37 S.Ct. 38.

In *McIntyre*, a debtor brokerage firm received certain stock certificates in error, which it then held as collateral for an individual's debt. Without notice to, or consent from the owner, it then appropri-

---

**13.** *Transamerica Comm. Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551 (9th Cir.1991).

**14.** In Latin, *res ipsa loquitur* means "the thing speaks for itself," and in tort law it is a doctrine "providing that, in some circum-

stances, the mere fact of an accident's occurrence raises an inference of negligence so as to establish a prima facie case." *Black's Law Dictionary* (7th ed.1999).

ated the certificates to its own use. The Court held that this act constituted a conversion and was "willful and malicious." *McIntyre,* 242 U.S. at 142, 37 S.Ct. 38.

Post-*Geiger,* in *Bailey,* the Ninth Circuit considered whether a conversion was a nondischargeable debt. The debtor/attorney had knowingly retained settlement proceeds, in which a former attorney allegedly had a lien, without compensating that creditor in any way. The bankruptcy court held that the debt was a nondischargeable conversion under § 523(a)(6). The BAP then reversed, on the grounds that the creditor did not have a lien interest and that conversion had not been proven. On appeal, the Ninth Circuit affirmed the BAP, but also stated:

> The conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, constitutes a willful and malicious injury within the meaning of § 523(a)(6).

*Bailey,* 197 F.3d at 1000 (citation omitted).

The Ninth Circuit further harmonized the pre- and post-*Geiger* conversion cases in *Jercich.* There, the employer-debtor withheld wages from an employee-creditor, who had obtained a prepetition judgment for unpaid wages. In the bankruptcy case, the creditor argued that the debtor had the "specific intent" to harm him by choosing to use the funds for personal investments rather than paying him the wages. The bankruptcy court disagreed and discharged the debt, but the Ninth Circuit reversed, defined the intent required for "willfulness," and cited *Bailey* with approval:

> In *Geiger,* the Court did not answer the question before us today-the precise state of mind required to satisfy § 523(a)(6)'s "willful" standard. The *Geiger* Court did, however, cite with approval its prior decision of *McIntyre v.*

*Kavanaugh* and the *Restatement (Second) of Torts* § 8A, cmt. A, p. 15 (1964).

In *McIntyre,* the debt arose from the debtor's conversion of the creditor's property. Holding that this debt was excepted from discharge under § 523(a)(6), the Court indicated that a wrongful act that is voluntarily committed with knowledge that the act is wrongful and will necessarily cause injury meets the "willful and malicious" standard of § 523(a)(6). **Similarly, the *Restatement* definition of intent cited by the *Geiger* Court requires the actor either to desire the consequences of an act or to know the consequences are substantially certain to result. Under this definition, the actor's deliberate act with knowledge that the act is substantially certain to cause injury is sufficient to establish willful intent.**

This definition is consistent with the approach this court took in the post-*Geiger* case of *In re Bailey,* where we stated that "[t]he conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, constitutes a willful and malicious injury within the meaning of § 523(a)(6)." ....

**We hold ... that under *Geiger,* the willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury or that the debtor believed that injury was substantially certain to occur as a result of his conduct.** We believe that this holding comports with the purpose [sic] bankruptcy law's fundamental policy of granting discharges only to the honest but unfortunate debtor.

*Jercich,* 238 F.3d at 1207–08 (emphasis added).

This conclusion was then followed in *Peklar*, another conversion case. Under California law, "wrongful intent" was not a required element of proof for conversion, as it is under federal law. *Peklar*, 260 F.3d at 1037. The court examined its prior *Bailey* opinion, and explained that *Bailey* had determined that a "failure to prove conversion is fatal to an argument that defendant's conduct caused 'willful and malicious injury.'" However, it held that *Bailey* did not stand for the "converse—that proof of conversion necessarily establishes such injury." *Peklar*, 260 F.3d at 1038. The court then examined the debtor's intent, and found that she reasonably believed that she had a legal right to remove and store furniture from her leased premises which belonged to her creditor. It determined that the conversion was therefore "innocent," "technical," or at most "negligent." *Id.* at 1039.

Following *Peklar* (and after proceedings in this case and briefing in this appeal), the Ninth Circuit published *Su*. Although the subjective standard for determining intent had been set forth in *Jercich*, there remained some confusion as to whether our circuit had adopted the Sixth Circuit's strictly subjective approach, under which a debt is nondischargeable under § 523(a)(6) only if the debtor intended to cause harm or knew that harm was substantially certain to occur as a result of his or her behavior, or the Fifth Circuit's approach, in which § 523(a)(6) nondischargeability requires either a subjective intent to cause an injury or "an objective substantial certainty of harm." *Su*, 290 F.3d at 1143–44 (citing *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455 (6th Cir.1999) and *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598 (5th Cir.1998)). The Ninth Circuit adopted the *Markowitz* strict subjective test, which focuses on the debtor's knowledge or belief. *Su*, 290 F.3d at 1144.

The recited case law, which forms the historical backdrop for this rule of law, indicates that the strict subjective standard must also be applied in a conversion case. Therefore, the mere intentional nature of the conversion is insufficient to satisfy the requirement that the creditor must strictly prove subjective intent to injure.

### (D) "Willfulness" Analysis

A debtor's actual knowledge is now the focus of the willfulness inquiry under § 523(a)(6). "[T]he subjective standard correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that harm to the creditor was substantially certain." *Su*, 290 F.3d at 1146.

Moreover, the debtor's actual knowledge can be found through circumstantial evidence. *Id.* at 1146 n. 6 ("[W]e are not suggesting that a court must simply take the debtor's word for his state of mind. In addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action."); *Nahman v. Jacks (In re Jacks)*, 266 B.R. 728, 741 (9th Cir. BAP 2001) ("[S]ubjective intent may be gleaned from objective factors.").

In the conversion context, the injury is the deliberate disposition of another's property without authority. *McIntyre*, 242 U.S. at 141, 37 S.Ct. 38 ("To deprive another of his property forever by deliberately disposing of it without semblance of authority is certainly an injury ...."). Proof of the debtor's knowledge that he or she is harming the secured creditor or the creditor's lien interest by converting the collateral establishes that the debtor either intended to inflict such

injury or believed that such injury was substantially certain to occur, and thus meets the willfulness requirement of § 523(a)(6). *See Su*, 290 F.3d at 1146; *Jercich*, 238 F.3d at 1208. *See also Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999) (focusing on debtor's state of mind, and stating that a willful conversion may be established "by evidence of both the debtor's knowledge of the creditor's lien rights and the debtor's knowledge that the conduct will cause particularized injury."); *Spokane Railway Credit Union v. Endicott (In re Endicott)*, 254 B.R. 471, 478–79 (Bankr.D.Idaho 2000) (" '[A] creditor must show that a debtor, when converting collateral, did so with the specific intent of depriving the creditor of its collateral or did so knowing, with substantial certainty, that the creditor would be harmed by the conversion.' ") (quoting *Avco Fin. Servs. of Billings v. Kidd (In re Kidd)*, 219 B.R. 278, 285 (Bankr.D.Mont. 1998)).

In *Banks v. Gill Distrib. Centers, Inc. (In re Banks)*, 263 F.3d 862, 869 (9th Cir.2001), the Ninth Circuit affirmed the trial court's determination that knowingly forcing a creditor to take substantially less than what it was owed amounted to an intentional injury under § 523(a)(6). The debtor argued, on appeal, that the bankruptcy court had applied the old *Cecchini* standard. The Court of Appeals disagreed, and held that the court had applied the correct *Geiger* standard because the bankruptcy court "found that ... Banks intended to injure" the creditor. *Banks*, 263 F.3d at 869. *See also 4 Collier on Bankruptcy* ¶ 523.12[1] at 523–92.1 (Alan N. Resnick and Henry J. Sommer, eds. 15th ed. rev.2002) (If the creditor can prove "not only that the debtor knew of the security interest, but also that the debtor knew that a transfer of the property was wrongful and certain to cause finan-

cial harm to the creditor," then the debt should be found nondischargeable.)

■ Turning to the case at bar, the evidence showed, and the bankruptcy court found, that when Debtor received the insurance check, he knew that he owed $321,111 from the prior crop year, that he had executed documents granting SB a Security Interest, and that although he had agreed to repay the debt formally, he had every intention of not repaying it. In addition, the evidence was clear that Debtor did not tell SB about the insurance settlement or money, but cashed the check and applied the money to his own use, knowing that SB would not be paid the full amount of its debt. *See* Transcript, July 3, 2001, at 18:13–21 (court's oral findings).

However, there is no finding here, as in *Banks*, that Debtor intended to injure SB, nor is there any finding that Debtor had "actual knowledge that harm to [SB] was substantially certain." *Su*, 290 F.3d at 1146. The trial court's reasoning, analogizing to *res ipsa loquitur*, (Transcript, July 3, 2001, at 18–19), does not reach the strictly subjective analysis now required by the Ninth Circuit. We must therefore remand this matter so that the bankruptcy court can more closely focus on this issue and make specific findings on the point.

### (E) The "Malicious" Element

■ Whether an injury is "malicious" requires a separate analysis. "A 'malicious' injury involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.' " *Jercich*, 238 F.3d at 1209 (quoting a pre-*Geiger* case, *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, at 793 (9th Cir.1997), which, in turn, quoted *Cecchini*, 780 F.2d at 1443).

The Supreme Court in *Geiger* did not address the "malicious" prong of

§ 523(a)(6), but it cited *McIntyre* with approval. The facts in *Cecchini* were similar to those in *McIntyre*. In *Cecchini*, the plaintiff and Cecchini's partnership were in a business relationship. Cecchini directed payments to be made to the partnership, which he knew should have been forwarded to the plaintiff, because, according to Cecchini, the plaintiff had not lived up to its agreement to reimburse the partnership for certain expenses. *Cecchini*, 780 F.2d at 1441. The Ninth Circuit held:

> When a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is "willful and malicious" even absent proof of a specific intent to injure.

*Cecchini*, 780 F.2d at 1443.

■■■ In *Littleton*, the Ninth Circuit explained its holding in *Cecchini* as meaning that in the case of a conversion—referring to a conversion that is both intentional and "willful"—"malice may be inferred from the nature of the wrongful act." *Littleton*, 942 F.2d at 554.

The bankruptcy court, in our case, recognized that *Cecchini's* holding regarding implied malice in the nondischargeability context is still good law when it opined: "[T]here is some conduct that is so contrary to the rights of the third party and that is so certain to harm the rights of the third party that if one can show that the conduct was intentional then it follows that the trier of fact may infer without any other evidence that the conduct injury [sic] was not only willful but that it was mali-

cious." (Transcript, July 3, 2001, at 18:6–11.)

■■■ In order to imply malice, however, it must first be established that the conversion was a "willful" injury. *Jercich*, 238 F.3d at 1209. Post-*Geiger*, the "done intentionally" element of a "malicious" injury brings into play the same subjective standard of intent which focuses on the converter's knowledge of harm to the creditor. *See Jercich*, 238 F.3d at 1209. In *Jercich*, an injury was determined to be "malicious" because, in relevant part, "the state court found Jercich knew he owed Petralia the wages and that injury to Petralia was substantially certain to occur if the wages were not paid." *Id.*[15]

■■■ Here, the bankruptcy court did not make the required finding regarding the intentional and "willful" nature of the conversion, and therefore, any inference of malice was premature.

### CONCLUSION

The bankruptcy court's finding that Debtor converted SB's insurance proceeds was not clearly erroneous. However, the court did not make the necessary finding, as clarified post-trial in *Su*, regarding Debtor's subjective intent to injure SB, in order to determine conclusively that the conversion was "willful and malicious" for purposes of § 523(a)(6).

While the evidence might support a determination that Debtor intended to harm SB, or knew that harm was substantially

---

**15.** Malice under § 523(a)(6) does not require a showing of biblical malice, *i.e.*, personal hatred, spite, or ill-will. *See McIntyre*, 242 U.S. at 141–42, 37 S.Ct. 38; *Cecchini*, 780 F.2d at 1443; *Bammer*, 131 F.3d at 791. *McIntyre* spoke in terms of "special malice," and stated that "special malice towards the individual" is not required. *See id.*, 242 U.S. at 141–42, 37 S.Ct. 38. Special malice is defined as "malice that is directed at a particular person." *Black's Law Dictionary* (7th ed.1990). Therefore, there may be some unresolved tension between the Ninth Circuit's "malicious" standard, which incorporates the subjective intent to injure, and *McIntyre*—a matter which is beyond the scope of this opinion, or the necessities of this case.

certain to follow his cashing the insurance check, such determination is necessarily dependent on witness demeanor and credibility. We should not take it upon ourselves to make such findings.

Accordingly, we **VACATE** the judgment as to § 523(a)(6), and **REMAND** to make appropriate findings and enter judgment thereon.