IN RE: James Manuel RODRIGUEZ,
Debtor,

State Farm Mutual Automobile
Ins. Co., Plaintiff,

v.

James Manuel Rodriguez, Defendant.

Bankruptcy Case No. 15–02444–CL7
Adversary Proceeding No. 15–90095–CL

United States Bankruptcy Court,
S.D. California.

Signed June 05, 2017

330

Joseph M. Pleasant, Reese Law Group, San Diego, CA, for Plaintiffs.

Nathan Shilberg, Debt Freedom Legal Clinic, El Cajon, CA, for Defendant.

## MEMORANDUM DECISION AND ORDER OF NONDISCHARGEABILITY

CHRISTOPHER B. LATHAM, JUDGE, United States Bankruptcy Court

This dispute involves a stolen 1995 Ferrari 348 Spider (the "Ferrari"). Debtor-defendant James Manuel Rodriguez ("Defendant") owned the Ferrari for many years before transferring title to his former live-in girlfriend, Shirley Sun. Ms. Sun insured the Ferrari with plaintiff-creditor State Farm Mutual Automobile Insurance Company ("Plaintiff"). The parties' relationship deteriorated, and Ms. Sun eventually began seeing William Curtis—though the three continued living, working, and traveling together. Ms. Sun and Mr. Curtis left Defendant's dental practice to form a spa business. Shortly thereafter, they traveled to China to visit Ms. Sun's terminally ill father. Defendant did not accompany them. Instead, he drove them to the airport and then took his belongings—and the Ferrari—from their common residence. He did so without legal advice, and in full knowledge that Ms. Sun owned the car and had possession of it and that he needed permission to drive it. He never returned the Ferrari despite numerous demands from Ms. Sun, Mr. Curtis, and the police. Instead, he sued Ms. Sun and Mr. Curtis in state court to remove Ms. Sun's name from the title and to enjoin them from selling, transferring, or modifying the car.

Ms. Sun filed a stolen vehicle report with the police department and a stolen vehicle claim with Plaintiff. On investigating the claim, Plaintiff determined that the policy and California law covered it, and paid Ms. Sun $56,335.51 for her loss. Plaintiff eventually recovered the Ferrari and sold it at auction. Plaintiff's complaint is pled as a subrogation claim. It asks the court to liquidate and hold nondischargeable $42,003.51 (the sum it paid Ms. Sun for her claim less the amount recovered at auction). It also seeks costs and interest.

The court now finds that Plaintiff's subrogation claim against Defendant is nondischargeable under § 523(a)(6).

## I. JURISDICTION AND VENUE

The court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and 157(b)(2)(1). Venue is proper under 28 U.S.C. § 1409(a).

## II. OVERVIEW AND HISTORY

### A. Defendant's Bankruptcy Case

In April 2015, Defendant filed a "bares bones" Chapter 7 petition (Bankr. ECF

No. 1). He originally scheduled $632,576 in assets and $171,744 in liabilities (Bankr. ECF No. 10 at p. 5). Schedule A discloses a $568,675 interest in his principal residence at 4049 Caminito Meliado in San Diego (the "Caminito Meliado Property"). Schedule B lists $63,901 in personal property—$58,000 of which is equipment for his dental practice, Pacific Wave Dental. *Id.* at pp. 8–10. Defendant claims various exemptions on Schedule C totaling $10,151. *Id.* at p. 11. Schedule D reveals no secured creditors. *Id.* at p. 12. Schedule F describes Plaintiff's claim as a $57,000 insurance claim lawsuit. *Id.* at p. 16. Schedule I lists Defendant's employer as "James Manu[e]l Rodriguez DDS Dental Corp."

Defendant's statement of financial affairs ("SOFA") discloses $31,460 in 2015 year-to-date business income and $0 for 2014. *Id.* at p. 24. Paragraph 4 lists one lawsuit, *Rodriguez v. Shirley Sun & William Curtis*, described as a "lawsuit—complaint for money" in San Diego County Superior Court. *Id.* at p. 25. Paragraph 5 discloses three pending or completed foreclosures on the following properties: (1) 5559 Porter Creek Road, San Diego, CA 92130 (the "Porter Creek Property") (by PennyMac Loan Services in July 2014); (2) a condo at Regents Road, La Jolla, CA 92037 (the "Regents Road Property") (by Chase Mortgage in August 2014); and (3) the Caminito Meliado Property (by NationStar Mortgage and scheduled for June 2, 2015). *Id.* at p. 26. Paragraph 15 shows the Porter Creek Property as Defendant's previous residence from 2005 to 2013. *Id.* at p. 28. Paragraph 16 discloses Suet Ha as Defendant's estranged wife. *Id.* And Paragraph 18 lists the following businesses: (1) James Rodriguez DDS Inc. dba Sun Smiles (dentistry practice, 2006–

April 2014) (the "Dental Practice"); and (2) James Manuel Rodriguez DDS Dental Corp. dba Pacific Wave Dental (dentistry practice, July 2014–present). *Id.* at p. 29.

Because this was a "no asset" case, no proofs of claim were submitted. *See* FED. R. BANKR. P. 2002(e). Plaintiff timely filed its adversary proceeding (ECF No. 1) (the "Complaint"). Defendant received his discharge in July 2015 (Bankr. ECF No. 31). The Trustee issued a report of no distribution in November 2015 (Bankr. ECF No. 42), and the case was closed the same day (Bankr. ECF No. 43).

### B. The Present Case

The Complaint alleges that Plaintiff insured Ms. Sun for loss, damage, or theft of the Ferrari. It asserts that Defendant wrongfully, intentionally, willfully, and maliciously took the car without Ms. Sun's permission. She filed an insurance claim on the loss. Plaintiff in turn investigated the claim, determined that the policy and California law covered it, and paid for Ms. Sun's loss. The Complaint is styled as a subrogation claim based upon Defendant's alleged theft and conversion of the Ferrari. It requests—in a single § 523(a)(6) cause of action [1]—that the court liquidate and hold nondischargeable the net amount Plaintiff paid on Ms. Sun's claim, plus costs and interest. Defendant answered the Complaint and interposed eight affirmative defenses. He also requested costs of suit (ECF No. 7).

The parties' efforts at mediation were unsuccessful (ECF No. 34). On March 11, 2016, Defendant's previous attorney withdrew as counsel (ECF No. 27). Defendant attempted briefly to represent himself after that. In March, he answered and pro-

---

1. Unless otherwise noted, all statutory citations are to the Bankruptcy Code, Title 11 of the United States Code.

pounded discovery (ECF Nos. 25, 28, 31, 32, and 33). And on March 14, 2016, he filed a pleading styled a "cross-complaint"[2] against Plaintiff and Ms. Sun alleging that Plaintiff failed to fully investigate Ms. Sun's fraudulent insurance claim. It addition, it did not contact Defendant and grossly mismanaged the underlying state court action against him. As a result, Plaintiff's loss was due to its own negligence. The cross-complaint asserted a single cause of action for equitable indemnification, *viz.*, that if Defendant is found liable in this adversary proceeding, then Plaintiff and Ms. Sun should indemnify him.

Defendant's discovery and pleading were untimely, however. The court therefore treated the cross-complaint as a nullity and excused Plaintiff from responding to the discovery (ECF No. 34). But it also allowed Defendant to bring a motion to modify the scheduling order under Rule 16. *Id.* He did so with his new attorney's assistance (ECF Nos. 36 and 40). The court granted the motion, extended the pre-trial deadlines, and invited Defendant to seek leave to file a counterclaim and third-party complaint under Rule 15 (ECF No. 44). He never did, however.

Discovery disputes then arose. On November 18, 2016, the court granted Plaintiff's motions to compel responses to interrogatories and production of documents. It also awarded Plaintiff $2,100 against Defendant and his counsel for reasonable expenses incurred in bringing those motions (ECF Nos. 67 and 68) (the "Discovery Orders").

Because Defendant did not comply with the Discovery Orders, Plaintiff moved to strike his answer and for monetary sanctions on November 21, 2016 (ECF No. 74). Defendant did not file a written opposition. At the hearing, the parties stipulated on the record that the motion could be granted. They further agreed that $2,100 in attorney's fees and costs would be imposed against counsel only. But Defendant was given a final opportunity to provide the outstanding verified discovery responses (ECF No. 77). And because he complied—though Plaintiff argued the responses were insufficient—the court denied the motion but awarded sanctions as the parties and counsel had agreed (ECF No. 81).

## C. The Pre–Trial Order and Trial

The parties submitted a joint stipulation of facts. *See* Plaintiff's Trial Ex. 12; ECF No. 87. The final pre-trial order incorporates many of them (ECF No. 93) (the "Pre–Trial Order"). The parties also agreed that the sole issue for trial was whether Defendant committed willful and malicious injury under § 523(a)(6) by taking and refusing to return the Ferrari. *See* the Pre–Trial Order at p. 8

## III. FACTUAL BACKGROUND AND FINDINGS

A great volume of immaterial evidence came in without objection. Despite repeated admonitions to focus the evidence on § 523(a)(6)'s elements, proof of many extrinsic facts was admitted. So far as they do not relate to the § 523(a)(6) claim's adjudication, the court need not—indeed, should not—make findings as to them. The court tried the matter over three days. What follows are the factual findings that bear on the § 523(a)(6) analysis, augmented with situational context.[3]

---

**2.** In federal practice, this would be a counterclaim as to Plaintiff and a third-party complaint as to Ms. Sun. *See* Fed. R. Civ. P. 13(a)(1) and 14(a)(1).

**3.** The court does this to make plain for the record the entire body of relevant facts it considered in reaching its conclusions.

### A. The Parties' Pre–Litigation History

Defendant graduated from dental school in 1981 and was licensed to practice dentistry in California the following year. *See* Plaintiff's Trial Ex. 10. He opened his first professional practice, Sun Smiles Dentistry, in January 2006 and has worked in Southern California ever since. *Id.* Ms. Sun is also a dentist, though licensed only in her native China. Defendant first acquired the Ferrari in late 2001 for $75,000. *See* the Pre–Trial Order at ¶ 12; Plaintiff's Trial Ex. 6.

Defendant and Ms. Sun became a couple in 2004. They jointly acquired a variety of property during their romantic relationship. And between October 2005 and May 2013, they lived together at the Porter Creek Property. *See* the Pre–Trial Order at ¶ 13. In 2005, Ms. Sun helped Defendant form the Dental Practice, serving as its office manager and business developer for over eight years. *Id.* She was also the referral source for some 70% of Defendant's patients.

In April 2007, after their relationship ended, Defendant married Ms. Sun's sister, Ms. Ha. *See* the Pre–Trial Order at ¶ 14. Ms. Ha has always lived in China, and she and Defendant are now separated. *Id.* In 2010, Ms. Sun began dating Mr. Curtis. *Id.* at ¶ 15. Shortly thereafter, Mr. Curtis moved into the Porter Creek Property with Ms. Sun and Defendant. *Id.* Between 2010 and 2013, the three would periodically travel to China to visit Ms. Sun's family. *Id.* Mr. Curtis began working at the Dental Practice as well in 2010. *Id.* From then on, Defendant treated Ms. Sun as a sister-in-law. And the three shared money and property as a household.

### B. Defendant's Financial Troubles, the June Hill Note, and Transfer of Title to Ms. Sun.

Before 2011, Defendant insured the Ferrari, a 1987 Porsche (the "Porsche"), and a 2003 Jaguar through Travelers Insurance. *See* Plaintiff's Trial Ex. 9. He also owned several real properties. But in 2011, he came into financial difficulty and could no longer make the mortgage payments on the Caminito Meliado and Regents Road Properties. *See* the Pre–Trial Order at ¶ 17. Indeed, both were underwater by May 2013. *Id.* Ms. Sun paid the Porter Creek Property's $3,400 monthly mortgage and property taxes for six to twelve months. *Id.* at ¶ 20. The Dental Practice was also struggling. In February 2013, Defendant put it into Chapter 11 (Case No. 13–02156–MM7). That case was eventually converted to Chapter 7 and the business dissolved. *Id.* at ¶ 17.

Defendant then began encumbering and transferring assets in response to mounting obligations. He put the Porsche in Ms. Sun's name—though it was stolen soon after. And he took two title loans from June Hill, the second of which is at issue here. *See* Defendant's Trial Ex. AA.[4] On February 22, 2011, Defendant gave Ms. Hill a $10,000 promissory note with a $5,000 "flat fee."[5] *Id.* (the "June Hill Note"). Under the June Hill Note's terms:

---

4. The parties stipulated on the record to admitting Defendant's Trial Ex. AA—even though it was not included in the Pre–Trial Order. After the close of evidence, however, it was discovered that the exhibit was missing from the court's exhibit binder. The court therefore granted the parties' stipulation for the exhibit's admission after evidence had closed (ECF No. 103).

5. Defendant was apparently required to pay this fee in exchange for receiving the loan proceeds. The court thus construes it as a species of origination fee—albeit at an astonishing 50% of the principal obligation.

- Defendant was required to deliver the Ferrari's pink slip over to Ms. Hill to hold as collateral pending repayment;
- Defendant was to make $1,000 weekly payments between March 5 and June 11, 2011 (fifteen in total); and
- If any payment were more than three days overdue, Ms. Hill could accelerate the note and charge Defendant a 15% late fee.

*See* Defendant's Trial Ex. AA.

In June 2011, final payment on the June Hill Note came due—though the parties dispute whether $1,000 or $12,000 was still owed. Suffice it to say, Defendant asked Ms. Sun to pay the June Hill Note's balance to save the Ferrari. Defendant disputed this at trial, arguing that: (1) there was only $1,000 left; (2) he was paying off the loan early; and (3) there was no reason for Ms. Sun to pay any of it. The court rejects Defendant's story and credits Ms. Sun and Mr. Curtis's testimony. In fact, on more than one occasion Defendant had asked Ms. Sun to put the Ferrari's title in her name to: (1) prevent his creditors from taking it; and (2) keep him from imperiling it again through hypothecation. Although the Ferrari would no longer technically be Defendant's property, he wanted it to remain safe, "in the family," and available for him to drive.

The first of fifteen weekly payments on the June Hill Note was due March 5, 2011. And the note's payoff date was June 11, 2011. Ms. Sun and Mr. Curtis testified that they (and possibly Defendant) went to Los Angeles around June 10, 2011—the day before the final payment was due—and gave Ms. Hill $12,000. They returned with the title Ms. Hill had been holding. That same day, all three went to the DMV and put the title solely in Ms. Sun's name. *See* Plaintiff's Trial Ex. 9; the Pre–Trial Order at ¶ 16. Defendant conceded that he transferred the Ferrari's title to Ms. Sun so she

would help him through his financial difficulties. *See* the Pre–Trial Order at ¶ 19. She never threatened to physically harm or do anything illegal to him if he refused. *Id.*

On the DMV Statement of Facts, the parties described the transfer as a gift and stated a $37,000 current market value. *See* Plaintiff's Trial Ex. 9. Defendant also encouraged Ms. Sun to report the transfer as a gift for tax purposes. For her part, Ms. Sun testified that she purchased the Ferrari for $50,000, $12,000 of that being the payoff on the June Hill Note. She gave Defendant the remaining $38,000 in three cash installments over two or three months. Defendant, on the other hand, claimed that $30,000 of that was actually money that Ms. Sun's parents owed him. There was no bill of sale presented at trial. In any event, the court need not decide if the transaction was a sale or gift, or how much money was involved. It is enough that in the end Ms. Sun alone was on title and had sole possession of the Ferrari. Defendant knew both of these facts, and agreed that he needed her authorization to drive the car.

After acquiring title, Ms. Sun insured the Ferrari with Plaintiff. *See* the Pre–Trial Order at ¶ 2; Plaintiff's Trial Ex. 1. Defendant never insured the car after transferring title to Ms. Sun. *See* the Pre–Trial Order at ¶ 3. But he was listed as an additional driver on Ms. Sun's policy for a time after the title transfer. *See* the Pre–Trial Order at ¶ 3; Plaintiff's Trial Ex. 9. Ms. Sun's insurance policy was in effect throughout 2013. *See* the Pre–Trial Order at ¶ 4; Plaintiff's Trial Ex. 1. It included coverage for loss due to theft. *See* the Pre–Trial Order at ¶ 5; Plaintiff's Trial Ex. 1.

## C. Defendant Took the Ferrari and Filed Suit in the State Court

In mid–April 2013, Ms. Sun and Mr. Curtis quit Defendant's dental practice to

open a spa business. This apparently caused a significant revenue loss to the business. On April 28, 2013, Ms. Sun and Mr. Curtis traveled to China to visit Ms. Sun's sick father (Defendant opted not to go). *See* the Pre–Trial Order at ¶ 22. They were gone between April 28 and May 4, 2013. *Id.* at ¶ 23. Defendant drove them to Los Angeles International Airport ("LAX") but did not pick them up, claiming that their return flight was significantly delayed, he had sleep apnea at the time, and he might fall asleep while driving. *See* Plaintiff's Trial Ex. 11; Defendant's Trial Ex. D. While they were in China, Defendant vacated the Porter Creek Property and took the Ferrari and various personal items with him.[6] *See* the Pre–Trial Order at ¶ 23; Plaintiff's Trial Ex. 11. He also left a note that the Ferrari was safe and being looked at for mechanical issues.

When Ms. Sun returned from China on May 4, 2013, she immediately discovered that Defendant had moved out and taken the Ferrari with him. *See* the Pre–Trial Order at ¶ 24. She then sent Mr. Curtis to Defendant's office to recover the car. Defendant refused and insisted that Mr. Curtis leave or he would call the police. Ms. Sun later demanded in writing that Defendant return the Ferrari, to no avail. *Id.* at ¶ 25.

Defendant did not have the benefit of legal advice before removing the Ferrari from the Porter Creek Property. On May 2, 2013, he and Rafael Santana discussed the situation with Dolores Contreras of Boyd Contreras, APC. But they did not mention the Ferrari at that meeting. Ms. Contreras then referred Defendant to her commercial litigation colleague, Nuni Mauricio Reznik. Defendant met with Mr. Reznik on May 6, 2013. *See* Defendant's Trial Ex. D. Defendant had already removed the Ferrari by then, however. So Mr. Reznik did not—indeed, could not—have counseled him about taking the car beforehand. His legal advice to Defendant was all post-taking. It mostly related to hiding places for the car and its condition, for example:

- A May 13, 2013 e-mail from Mr. Reznik advising Defendant to stop all maintenance and repairs on the car until the state court could rule on a future preliminary injunction application. *See* Defendant's Trial Ex. E;

- A May 14, 2013 e-mail from Defendant telling Mr. Reznik that the Ferrari was at Mr. Maxwell's shop. *See* Defendant's Trial Ex. F;

- A May 14, 2013 e-mail from Mr. Reznik saying he would ask the state court to order the Ferrari held at a neutral, third party location pending the case's outcome. *See* Defendant's Trial Ex. G;

- A May 15, 2013 e-mail from Defendant telling Mr. Reznik that he had moved the Ferrari to a neutral location as advised. *See* Defendant's Trial Ex. K;

- A July 8, 2013 e-mail from Defendant to Mr. Reznik stating that he would disclose the Ferrari's location and agreed not to operate it on the streets. *See* Defendant's Trial Ex. S; and

- An August 7, 2013 e-mail from Defendant telling Mr. Reznik that the Ferrari was in a residential garage in San Diego. *See* Defendant's Trial Ex. T.[7]

6. The exact date this occurred is not absolutely clear—though it definitely happened before Ms. Sun returned from China. But Defendant's March 9, 2016 deposition adverts to camera footage showing him driving the Ferrari off the premises on May 4, 2013, a Saturday. *See* Plaintiff's Trial Ex. 11. Defendant then moved into a bedroom at his mechanic, Steve Maxwell's, house.

7. Defendant's testimony and evidence suggest that he concealed the Ferrari in "neutral locations." Not so. The hiding places were far from neutral because they were under Defen-

That said, Defendant: (1) was aware that Ms. Sun and Mr. Curtis were looking for the Ferrari and went to Mr. Maxwell's shop to reclaim it; (2) hoped that Ms. Sun "[would] not try to get the car" and so intended to deprive her of it; (3) planned a restraining order to keep Ms. Sun from retrieving the car; and (4) was aware he might be arrested for theft. *See, e.g.*, Defendant's Trial Ex. P. Defendant never returned the Ferrari to Ms. Sun. *See* the Pre–Trial Order at ¶ 7. He was angry that she and Mr. Curtis had left his dental practice in mid–April 2013. He was also attached to the car and worried it would be sold. That concern was well-founded. Ms. Sun had threatened to sell the Ferrari and had it appraised. When he had the car, Mr. Maxwell found a written estimate of value in the glove box.

On May 15, 2013, Defendant sued Ms. Sun and Mr. Curtis in San Diego County Superior Court (Case No. 37–2013–0004885) for fraud by undue influence, fraud by intentional misrepresentation, and conversion. *See* Defendant's Trial Ex. N (the "State Court Action"). Defendant alleged that in June 2011, he transferred title to the Ferrari to Ms. Sun without consideration and that the apparent consent to transfer title was obtained through undue influence. He also alleged that he was obliged to ask for permission to drive the vehicle, which could be denied depending on Ms. Sun's mood.[8] The complaint sought damages against Ms. Sun and Mr. Curtis, removal of her name from title, and an injunction preventing Ms. Sun and Mr. Curtis from selling, transferring, or modifying the car. *See* Defendant's Trial Ex. N; the Pre–Trial Order at ¶¶ 27 and 28.

Since the State Court Action's filing, Defendant has given inconsistent stories concerning the Ferrari's title. Specifically:

- In his state court complaint, he claimed that Ms. Sun obtained title through undue influence. *See* the Pre–Trial Order at ¶ 28; Defendant's Trial Ex. N;

- In his May 5, 2014 deposition in the State Court Action, he testified that Ms. Sun coerced him into signing title to her—essentially giving him an ultimatum and making it a condition for financial assistance. *See* the Pre–Trial Order at ¶ 29; Plaintiff's Trial Ex. 10;

- In his January 20, 2016 answer to Plaintiff's interrogatories in this case, he stated that he never transferred title to Ms. Sun; rather, she illegally took title by forging Defendant's name. *See* the Pre–Trial Order at ¶ 32; Plaintiff's Trial Ex. 6.

- In his March 9, 2016 deposition in this case, he testified that Ms. Sun obtained title illegally and what she received was "not in [his] handwriting." *See* the Pre–Trial Order at ¶ 30; Plaintiff's Trial Ex. 11. Later in that same deposition, he testified that he decided to sue Ms. Sun after he discovered the title was in her name. *See* Plaintiff's Trial Ex. 11.

- When asked in Plaintiff's second set of interrogatories why his story kept evolving, he responded that Ms. Sun deceived him about what he was signing when he transferred title to her. *See* the Pre–Trial Order at ¶ 34.

- He testified at trial in this case that he did not understand what he was signing when he transferred title to Ms. Sun. And he told Mr. Maxwell that

---

dant's control and maintained by third parties aligned with him.

8. Defendant did not assert that Ms. Sun acquired title by forgery or trickery, or that he was unaware she was the Ferrari's legal owner. Pre–Trial Order at ¶ 28.

Ms. Sun changed title into her own name after she started "doing his paperwork."

Given these inconsistencies, Defendant's credibility is weak in the court's view.

### D. Plaintiff's Subrogation Claim

Ms. Sun insured the Ferrari with Plaintiff as soon as she took title, listing Defendant as an additional driver on her policy. *See* the Pre–Trial Order at ¶ 3; Plaintiff's Trial Ex. 9. On July 2, 2013, Ms. Sun filed a stolen vehicle report with the San Diego Police Department (the "SDPD"). *See* the Pre–Trial Order at ¶¶ 8 and 26. On July 29, 2013, she made a stolen vehicle claim to Plaintiff. *Id.* at ¶ 9. Plaintiff investigated the claim, determined it was covered, and paid Ms. Sun $56,855.51 on August 30, 2013. *Id.* at ¶ 10. Plaintiff eventually recovered the Ferrari and sold it at auction. The unrecovered balance is $42,003.51. *Id.*[9] The parties agree that Plaintiff is rightly Ms. Sun's subrogee. *Id.* at ¶ 11.

### IV. LEGAL ANALYSIS AND CONCLUSIONS

#### A. Section 523(a)(6) Nondischargeability

■ The Bankruptcy Code is designed to provide a "fresh start" to the discharged debtor. *United States v. Sotelo*, 436 U.S. 268, 280, 98 S.Ct. 1795, 56 L.Ed.2d 275 (1978). As a result, the Supreme Court has interpreted exceptions to the broad presumption of discharge narrowly. *Kawaauhau v. Geiger*, 523 U.S. 57, 62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). As we have observed "exceptions to discharge should be limited to dishonest debtors seeking to abuse the bankruptcy system in order to evade the consequences of their misconduct." *Sherman v. SEC (In re Sherman)*, 658 F.3d 1009, 1015–16 (9th Cir. 2011).

*Hawkins v. Franchise Tax Bd. of California*, 769 F.3d 662, 666 (9th Cir. 2014).

■ The creditor bears the burden of proving by a preponderance of the evidence that the particular debt falls within one of § 523(a)'s exceptions to discharge. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *see also In re Betancourt*, 2015 WL 3500322, at *5 (9th Cir. BAP June 3, 2015). Under § 523(a)(6), debts "for willful and malicious injury by the debtor to another entity or to the property of another entity" are nondischargeable. 11 U.S.C. § 523(a)(6). The court analyzes the "willful" and "malicious" dimensions of § 523(a)(6) separately. *Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 706 (9th Cir. 2008); *In re Lawson*, 2015 WL 1291366, at *4 (9th Cir. BAP Mar. 20, 2015) (reinforcing *Carillo v. Su (In re Su )*, 290 F.3d 1140, 1146–47 (9th Cir. 2002) and the application of a separate analysis in each prong of "willful" and "malicious")).

■ Both willfulness and maliciousness must be proven to apply § 523(a)(6). *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010).

The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. ...

---

9. Evidence of a different value also came in, including Mr. Maxwell's $48,000 estimate after repairs. But this is immaterial. Plaintiff's loss was exactly $42,003.51. It is undisputed that it paid Ms. Sun for the Ferrari's theft. And that is the base measure of damages in this case. *See, e.g., In re Armstrong*, No. 04-04320-TLM, 2006 WL 2850527, at *16 (Bankr. D. Idaho Oct. 3, 2006) ("The measure of damages for a conversion violating § 523(a)(6) is the value of the property converted or diverted").

[T]he (a)(6) formulation triggers in the lawyer's mind the category intentional torts, as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend the consequences of an act, not simply the act itself.

*Geiger*, 523 U.S. at 61–62, 118 S.Ct. 974 (emphasis in original). Thus, tortious conduct is an obligatory element for a § 523(a)(6) nondischargeability finding. *Lockerby v. Sierra*, 535 F.3d 1038, 1040 (9th Cir. 2008) (citing *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1205 (9th Cir. 2001) ("[a]n intentional breach of contract is excepted from discharge under § 523(a)(6) only when it is accompanied by malicious and willful *tortious conduct*") (emphasis in *Jercich* )), *Peklar v. Ikerd (In re Peklar)*, 260 F.3d 1035, 1038 (9th Cir. 2001) ("Debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)."). Moreover, "[c]onduct is not tortious under § 523(a)(6) simply because injury is intended or 'substantially likely to occur,' but rather is only tortious if it constitutes a tort under state law." *Lockerby*, 535 F.3d at 1041 (citing *In re Jercich*, 238 F.3d at 1206). Accordingly, § 523(a)(6) requires state-specific tortious conduct. *Lockerby*, 535 F.3d at 1043.

### 1. Willful Injury

A plaintiff can satisfy the "willful" injury requirement by proving either of its two modes, namely that the debtor: (1) had a subjective motive to inflict injury; or (2) believed that injury was substantially certain to result from his conduct. *See In re Su*, 290 F.3d at 1142; *In re Jercich*, 238 F.3d at 1208. The debtor "must have intended the consequences of the action, not just the action itself." *In re Thiara*, 285 B.R. 420, 427 (9th Cir. BAP 2002). The willfulness standard "focuses on the debtor's state of mind and precludes applica-

tion of § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that harm to the creditor was substantially certain." *Id.* at 432 (citing *In re Su*, 290 F.3d at 1146).

Further, "the debtor's actual knowledge can be found through circumstantial evidence." *Id.* (citing *In re Su*, 290 F.3d at 1146 n.6 ("[W]e are not suggesting that a court must simply take the debtor's word for his state of mind. In addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action.")). *See also Nahman v. Jacks (In re Jacks)*, 266 B.R. 728, 741 (9th Cir. BAP 2001) ("[S]ubjective intent may be gleaned from objective factors."); *In re Galan*, 455 B.R. 214, 222 (Bankr. D. Idaho 2011) ("In proving a debtor's actual knowledge, the Court may consider circumstantial evidence, including an aggregation of pre-injury acts, tending to establish what the debtor must have actually known at the time he committed the conduct producing the injury."). And, "[w]hen determining the debtor's intent under § 523(a)(6), there is a presumption that the debtor knows the natural consequences of his actions." *Le v. Huynh*, BAP No. AZ–15–1364–JuFL, 2016 WL 5956652, at *5 (9th Cir. BAP Oct. 13, 2016) (citing *In re Ormsby*, 591 F.3d at 1206).

### 2. Malicious Injury

"A 'malicious' injury involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.' " *In re Jercich*, 238 F.3d at 1209. This is an objective standard. *In re Chin–Liang Chan*, 325 B.R. 432, 436 (Bankr. N.D. Cal. 2005). "Malice may be inferred based on

the nature of the wrongful act." *In re Ormsby*, 591 F.3d at 1207; *see also Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 554 (9th Cir. 1991); *In re Russell*, 203 B.R. 303, 318 (Bankr. S.D. Cal. 1996) ("A plaintiff must show a defendant committed a 'wrongful act ... done intentionally, [which] necessarily produces harm and is without just cause or excuse ... *even absent proof of a specific intent to injure.*'") (emphasis in original).

 Before malice may be inferred, however, the willful injury must be established. *In re Ormsby*, 591 F.3d at 1207 (citing *In re Thiara*, 285 B.R. at 434). Additionally, "post–*Geiger*, the 'done intentionally' element of a 'malicious' injury brings into play the same subjective standard of intent which focuses on the converter's knowledge of harm to the creditor." *In re Thiara*, 285 B.R. 420 at 434; *see also In re Jercich*, 238 F.3d at 1209. Malice "does *not* require a showing of biblical malice, i.e., personal hatred, spite or ill-will." *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 791 (9th Cir. 1997) (citing *Impulsora Del Territorio Sur, S.A. dba Hotel Solmar v. Robustelli (In re Cecchini)*, 780 F.2d 1440, 1442–43 (9th Cir. 1986)) (emphasis in original). "Nor does it require a showing of an intent to injure, but rather it requires only an intentional act which causes injury." *Id.*

### a. The Affirmative Defense of Just Cause or Excuse

 As to the fourth element, the Ninth Circuit has defined "just" as " 'honorable and fair in dealings and actions," "consistent with moral right," and "valid within the law.' " *In re Bammer*, 131 F.3d at 791. It has also stated:

> The root of the mistake made by the courts below was to have permitted a purely subjective element, i.e., "compas-

sion," to constitute "just cause or excuse." Neither the courts below nor Steven Bammer have "cited any authority or even made a credible argument that ... subjective intent justifies or excuses" behavior that is otherwise wrongful. * * * Here, the separate question of whether Steven's acts would cause harm was decided *against* Steven by the bankruptcy court in a specific finding. As a matter of law, Steven Bammer's unprincipled behavior cannot be regarded as "just" . . . .

*In re Bammer*, 131 F.3d at 793 (emphasis in original).

Further,

> Although in general a plaintiff has the burden to prove by a preponderance of the evidence that the debt arose from willful and malicious conduct, *In re Jercich*, 238 F.3d at 1208, just cause or excuse is in the nature of an affirmative defense. *Jercich* by implication supports the position that a debtor must first put forth the just cause or excuse.

*In re Hagele*, BAP No. EC–15–1033–JuDTa, 2016 WL 3965899, at *6 (9th Cir. BAP July 18, 2016). And "[e]vidence of specific intent to injure can negate just cause or excuse." *In re Armstrong*, No. 04-04320-TLM, 2006 WL 2850527, at *11 (Bankr. D. Idaho Oct. 3, 2006) (citing *In re Khaligh*, 338 B.R. 817, 831 (9th Cir. BAP 2006)).

### b. Advice of Counsel as Just Cause or Excuse

 The Bankruptcy Appellate Panel has implicitly recognized that reliance on counsel's advice can constitute just cause or excuse under § 523(a)(6). *See, e.g., In re Smith*, No. EC–009–1117–MkMoJu, 2009 WL 7809005, at *13 (9th Cir. BAP Dec. 17, 2009) (analyzing whether the bankruptcy court erred in finding that Smith did not seek or receive any legal advice regarding the propriety of adopting his infringing

names). The Bankruptcy Court for the District of Oregon is in accord. *In re Treon*, No. 07–31112–elp7, 2008 WL 65575, at *7 (Bankr. D. Ore. Jan. 4, 2008). There, a debtor sought legal advice concerning her rights under a noncompetition and employment agreement. Analyzing § 523(a)(6)'s malice prong, the court found that the debtor did not intentionally breach her contracts by working for one of the creditor's former clients because she "relied in good faith on her attorney's advice that accepting employment from a former client was not a breach of her contracts." *In re Treon*, 2008 WL 65575, at *7 (citing *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986) (a debtor's intent to hinder or delay creditors may be vitiated by good faith reliance on the advice of counsel)). The court noted that:

> There is nothing inherently wrongful about a person accepting employment offered by a former client. The contracts debtor signed did not expressly state that they prohibited employment by former clients. Debtor is not a sophisticated business person. Her training is as a hairdresser. Her earnings were not substantial—she earned a little over $10 per hour ($250 for a 24 hour shift) working for the Hinmans. Under these circumstances, it was reasonable for her to consult and follow the advice of an attorney when her former employer threatened her.

*In re Treon*, 2008 WL 65575, at *7.

The court also found that the debtor's conduct was not done "without excuse." While breach of a non-compete and non-

solicitation provision can be considered wrongful, it reasoned, the court determined that the debtor reasonably relied on her attorney's interpretation that the contract's language did not include "former clients." *Id.* Whether the court ultimately agreed with the attorney's contractual interpretation was of no moment in determining if the debtor's reliance was in good faith and thus excused her conduct under § 523(a)(6). *Id. See also In re Nolan*, 220 B.R. 727, 731 (Bankr. D.C. 1998) ("[I]f Nolan reasonably relied on advice of counsel in taking a passive role, that might shield her from a finding of maliciousness, even though it might not have shielded her from liability to Hamilton."); *Dorr, Bentley & Pecha, CPAs v. Pasek (In re Pasek)*, 983 F.2d 1524 (10th Cir. 1993) (advice of counsel and other factors supported determination of no malice).[10]

Having considered the relevant authorities, the court finds *In re Hagele's* reasoning most persuasive. It therefore treats the "just cause or excuse" element of malicious injury as an affirmative defense for Defendant to prove. Plaintiff has made a prima facie showing of all four of malicious injury's elements. Thus the court need not resolve whether the burden of proof is always a defendant's in the first instance, or whether that defensive burden arises only after the plaintiff has met some initial showing.

## B. State Law Conversion and § 523(a)(6) Nondischargeability

■ Section 523(a)(6)'s language covers conversion. *See, e.g., In re Sandoval*,

---

**10.** But there are other cases holding that reliance on counsel's advice is not just cause under § 523(a)(6). *See, e.g., In re Krause*, 510 B.R. 172, 189 (Bankr. N.D. Ill. 2014); *In re Rosenberg*, 2007 WL 2156282, at *5 (Bankr. N.D. Ohio July 23, 2007) (relying on counsel's advice in violating a preliminary injunction is not just cause or excuse). And still other au-

thorities have found that advice of counsel is not an affirmative defense to § 523(a)(6) nondischargeability at all. Rather, "it is a species of evidence that is offered to negate the requisite element of intent under § 523(a)(6)." *In re Gotwald*, 488 B.R. 854 (Bankr. E.D. Penn. 2013).

341 B.R. 282, 295 (Bankr. C.D. Cal. 2006) (citing *Del Bino v. Bailey (In re Bailey)*, 197 F.3d 997, 1000 (9th Cir. 1999); *In re Littleton*, 942 F.2d at 554)); *In re Thomas*, 47 B.R. 27, 33 (Bankr. S.D. Cal. 1984) ("Congress intended that the phrase 'willful and malicious injury' found in Section 523(a)(6) of the Code would cover a willful and malicious conversion."). The Ninth Circuit has held that "[t]he conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, constitutes a willful and malicious injury within the meaning of § 523(a)(6)." *In re Bailey*, 197 F.3d at 1000 (quoting *In re Littleton*, 942 F.2d at 554).

Although federal law governs a debt's dischargeability, courts look to state law to determine whether a conversion has occurred. *In re Sandoval*, 341 B.R. at 295 (citing *In re Jercich*, 238 F.3d at 1206; *In re Bailey*, 197 F.3d at 1000). In California, "[t]he elements of a conversion are the creditor's ownership or right to possession of the property at the time of the conversion; the debtor's conversion by a wrongful act or disposition of property rights; and damages." *In re Thiara*, 285 B.R. at 427 (quoting *Farmers Ins. Exch. v. Zerin*, 53 Cal.App.4th 445, 451, 61 Cal.Rptr.2d 707 (1997)); *In re Horne*, 549 B.R. 241, 250 (Bankr. E.D. Cal. 2016) ("Under California law, conversion is the wrongful exercise of dominion over the property of another."); *Welco Electronics, Inc. v. Mora*, 223 Cal.App.4th 202, 208–09, 166 Cal.Rptr.3d 877 (2014).

But whether a defendant's actions amount to conversion under California law "is not dispositive of whether the underlying claims are nondischargeable under § 523(a)(6)." *In re Manser*, 99 B.R. 434, 435–36 (9th Cir. BAP 1989) (citing *In re Cecchini*, 780 F.2d at 1443–44; *Houtman v. Mann (In re Houtman)*, 568 F.2d 651

(9th Cir. 1978)). Indeed, "[b]oth willfulness and maliciousness must be proven to block discharge under section 523(a)(6). That applies equally to a debt based on conversion in order for a debt arising from conversion to be excepted from discharge under § 523(a)(6)." *In re Horne*, 549 B.R. at 249.

The Bankruptcy Appellate Panel has recently stated:

> Under California law, conversion is the wrongful exercise of dominion over the property of another. The three elements of conversion under California law do not include the elements of the "willful" and "malicious" prongs under § 523(a)(6). Conversion under California law does not require a showing that the defendant subjectively intended to injure the plaintiff or subjectively knew that the defendant's conduct was substantially certain to injure the plaintiff. * * * Similarly, conversion under California law does not necessarily implicate "maliciousness." Maliciousness requires (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse. While one of the elements of conversion encompasses a "wrongful act," the other elements do not satisfy the remaining maliciousness prongs. We thus conclude that the conversion, in and of itself, is not necessarily "malicious."

*In re Zeeb*, BAP No. CC–15–1012–FKiKu, 2015 WL 6720934, at *5–6 (9th Cir. BAP Nov. 3, 2015). *See also In re Peklar*, 260 F.3d at 1037 ("Under California law, a conversion is not per se always a willful and malicious injury to the property of another."). The court must therefore find that the conversion was intentional, as *Geiger* and its progeny direct. *In re Thiara*, 285 B.R. at 429. And "the strict subjective standard must also be applied in a conversion case ... the mere intentional nature of the conversion is insufficient to

satisfy the requirement that the creditor must strictly prove subjective intent to injure." *Id.* at 432.

 Consequently, to prevail on a § 523(a)(6) conversion claim, a plaintiff "must first establish that a conversion has occurred under California law, and second that the conversion is willful and malicious." *In re Sandoval,* 341 B.R. at 295. *See also In re Aalam,* 538 B.R. 812, 823 (Bankr. C.D. Cal. 2014) (same). This accords with the BAP's mandate that under *Jercich,* the court must consider whether Defendant's conduct was tortious on the one hand, and both willful and malicious on the other. *Le v. Huynh,* 2016 WL 5956652, at *5 (citing *In re Jercich,* 238 F.3d at 1206–09). And per *Lockerby,* the court analyzes whether Defendant's conduct constituted a state law tort.

Now, without question Defendant transferred the Ferrari's title to Ms. Sun in June 2011. She had exclusive title and possession, and the parties agree that Defendant needed her permission to drive the car. The court rejects Defendant's assertion that he believed the Ferrari was shared property and that there were no "rules" about who in the household owned what. As explained below, he intentionally converted the Ferrari when he took it from the Porter Creek Property in May 2013. His actions necessarily caused injury. This may well also have been a larceny or embezzlement. But the Complaint is pled under § 523(a)(6) only. So the court limits its analysis accordingly.

 For the following reasons, the court concludes that Defendant: (1) intentionally converted the Ferrari under California law, thus satisfying § 523(a)(6)'s intentional tort requirement; and (2) willfully and malicious injured Ms. Sun. It will therefore enter a $42,003.51 nondischargeable judgment for Plaintiff.

## C. Defendant Intentionally Converted the Ferrari

Defendant plainly committed a state law conversion. First, he transferred the Ferrari's title into Ms. Sun's name on June 10, 2011 after the parties returned from paying off the June Hill Note. From then on, Ms. Sun had both title and possession of the car. While she listed Defendant as an additional driver on her insurance policy, he needed her consent to drive the Ferrari. Ms. Sun and Mr. Curtis were in China between April 28 and May 4, 2013. During that time, Defendant removed the Ferrari from the Porter Creek Property and never returned it. The first element is thus satisfied.

Second, Defendant's conduct was wrongful and violated Ms. Sun's property rights. The evidence overwhelmingly shows that Ms. Sun did not give Defendant permission to take the Ferrari—and was quite upset when she learned he had. Nor she did have knowledge of Defendant's conduct. Indeed, she could not have since she was far away, or in transit, when the conversion occurred. She immediately sent Mr. Curtis to Defendant's office to demand the car back. She and Mr. Curtis also went to Mr. Maxwell's garage for information about where it was. In addition, she filed a stolen vehicle report with the SDPD on July 2, 2013. And she made a stolen vehicle claim to Plaintiff on July 29, 2013. Ms. Sun undoubtedly wanted her Ferrari back. Moreover, Defendant knew his conduct was wrongful since he was aware that he might be arrested for it.

Finally, Defendant's conduct harmed Ms. Sun. The conversion was necessarily injurious because it deprived her of her property.

The court thus finds that Defendant wrongfully and intentionally exercised dominion over Ms. Sun's property without

her knowledge or consent. He intentionally converted the Ferrari under California law. This necessarily caused Ms. Sun injury. And, as explained in Section IV.E *infra,* his actions were unjustified and without excuse. Under *Bailey* and *Littleton,* the court could simply conclude that the debt owed Plaintiff is nondischargeable under § 523(a)(6). For the sake of analytical completeness, however, it now analyzes § 523(a)(6)'s "willful" and "malicious" prongs separately.

### D. Defendant's Conduct Was Willful

Section 523(a)(6) willfulness is met if Plaintiff establishes that either: (1) Defendant had a subjective motive to inflict injury upon Ms. Sun; or (2) he believed that injury was substantially certain to result from his conduct.[11] It proves both. Either would suffice to satisfy the willfulness element. For the sake of analytical completeness, however, the court addresses each in turn.

### 1. Defendant Intended to Inflict Injury

Plaintiff must demonstrate that Defendant intended the consequences of his action, not just the action itself. His subjective motivation can be found through circumstantial evidence. And Defendant is presumed to know the natural consequences of his actions. Here, the evidence shows that he was angry with Ms. Sun and Mr. Curtis. They left his dental practice, which hurt him financially. In addition, Ms. Sun did not buy him a new car with the money Plaintiff paid her for the Ferrari's theft. He believed she planned to use it for her new spa business instead. Overall, Defendant felt Ms. Sun and Mr. Curtis had abandoned him.

His motivation for taking the Ferrari was thus two-fold: to get back at Ms. Sun and Mr. Curtis for abandoning him, and to keep Ms. Sun from selling the car.[12] His willful intent suffused the entire scheme, and that satisfies § 523(a)(6). A secondary motive does not neutralize it. He admitted in his May 5, 2014 deposition that Ms. Sun planned to sell the Ferrari. She had it appraised and was contemplating a possible sale. And he told Mr. Maxwell that was his motivation for taking the car.

Moreover, Defendant's plan was premeditated. He cancelled the China trip after Ms. Sun and Mr. Curtis quit his dental practice. Yet he pretended everything was fine and agreed to pick them up from LAX upon their return. He removed the Ferrari from the Porter Creek Property while they were away. He planned and

---

11. The Ninth Circuit has stated that "subrogation is the substitution of one party in place of another with reference to a lawful claim, demand or right. It is a derivative right, acquired by satisfaction of the loss or claim that a third party has against another. Subrogation places the party paying the loss or claim (the "subrogee") in the shoes of the person who suffered the loss (the "subrogor"). Thus, when the doctrine of subrogation applies, the subrogee succeeds to the legal rights and claims of the subrogor with respect to the loss or claim." *Hamada v. Far East Nat'l Bank (In re Hamada),* 291 F.3d 645, 649 (9th Cir. 2002). In this instance, Plaintiff is the subrogee paying the subrogor's (Ms. Sun) loss. It succeeds to her legal rights and claims with respect to her loss or claim. That includes recovering the payout amount for the Ferrari's theft in this adversary proceeding. Accordingly, if Plaintiff proves that Defendant's conduct against Ms. Sun was willful and malicious, it will succeed on its § 523(a)(6) subrogation claim against Defendant. *See, e.g., In re Burton,* No. 08-50104, 2009 WL 537163, at *6 (Bankr. E.D. Tenn. Feb. 20, 2009) ("It is generally well-settled that the subrogee may assert the creditor's right to bring a nondischargeability action").

12. Defendant, including his trial brief, has repeatedly described the Ferrari as his most prized possession.

then filed the State Court Action—which included a temporary restraining order application. And he concealed the Ferrari's location from May to August 2013, despite Ms. Sun and the SDPD's demands that he return it.

Defendant's own trial brief also points to his ill will. It gives voice to his personal dislike of Ms. Sun, calling her a "conniving entrepreneur, an Asian Cruella–De–Ville of sorts" (ECF No. 94, p. 2). Describing his actions as a "polygamous divorce," Defendant admits that he was going to drop a "nuclear bomb" on the family in April 2013 and did not want to be anywhere near "ground zero" when it hit. Moreover, "the hammer would drop" once the family learned of the State Court Action (*Id.* at p. 4). This conjures images of lasting damage being deliberately inflicted.

It is apparent that Defendant knew he had done something wrong after he took the law into his own hands because he: (1) continued hiding the car; (2) ignored various demands to return it; and (3) knew after early July 2013 that anyone found driving it would be arrested (per the SDPD). He also knew that Ms. Sun would be upset, even though she could not drive the Ferrari herself. The court rejects Defendant's assertion that Ms. Sun did not care about the car. Simply put, he (without warning or explanation) failed to pick up Ms. Sun and Mr. Curtis from the airport. Their flight from Asia was delayed and arrived late at night. Defendant simply took his personal belongings and the Ferrari and left the Porter Creek Property. He then hid the Ferrari and sued Ms. Sun for title. This was no doubt unsettling to her—he knew she was upset to begin with because her father was dying.

The court infers from all of this a subjective intent to harm Ms. Sun. Defendant's contention that he was taking the Ferrari to Mr. Maxwell's garage for re-pairs was just a slender pretext for seizing it from Ms. Sun. And the court rejects Defendant's suggestion that he intended to return the car in a day or two when the repairs were done. They would cost nearly $16,000, and he did not—indeed, could not—pay them. *See* Defendant's Trial Ex. I.

## 2. Defendant Believed that Injury Was Substantially Certain to Result

Yet even if Plaintiff had not shown an intent to inflict injury, the court would still find the willfulness element has been satisfied in its second mode. The reason is because it is plain Defendant believed his conduct was all but certain to injure Ms. Sun. His plan to take the Ferrari was premeditated—that is, fully thought out in all material respects. He knew that the car's title was in Ms. Sun's name and that he needed authorization to drive it because she had possession. Thus, he undoubtedly understood the car was not his. Yet still he took it. And as a logical matter, appropriating someone's property necessarily harms them because the loss works a deprivation. The Ferrari could not be both in Ms. Sun's garage and at the same time in Mr. Maxwell's miles away. In the court's view, this incontrovertible fact—given the legal conclusion of *intentional* conversion—satisfies § 523(a)(6) willfulness.

Moreover, even if the law required a separate injury supplemental to the property loss itself—that is, a further consequence to the conversion—it is present here as well. The Ferrari was intrinsically valuable (based upon Mr. Maxwell's testimony and the amount Plaintiff paid to cover its loss). And the conversion deprived Sun of more than just the possession and use of her car. She also lost all other aspects of its utility to her, for example as a means of liquidity through sale or hypothecation, and its prestige value as an exotic sports car. That she was unable to

drive the Ferrari herself changes none of this. By taking the Ferrari and refusing to return it, Defendant had to know that he was both preventing its sale, and depriving Ms. Sun of her use and enjoyment of it.

Plaintiff has shown that Defendant was substantially certain that his conversion would injure Ms. Sun. For the reasons above, Plaintiff has separately established Defendant's willfulness under § 523(a)(6).

### E. Defendant Acted with Malice

Because Plaintiff establishes the "willful" prong's first and second modes, the court could simply infer malice. It will nevertheless analyze the requirements of maliciousness. The first three elements are easily met for many of the reasons above. The court has already concluded that Defendant intentionally and wrongfully converted the Ferrari, and that his actions necessarily injured Ms. Sun in various ways. The fourth prong—no just cause or excuse—is more complicated and merits fuller discussion.

Under *Hagele*, the "malice" prong's fourth element is in the nature of an affirmative defense. It is therefore Defendant's burden to show just cause or excuse for converting the Ferrari. He fails to do so. The court has already found ample evidence of a specific intent to injure Ms. Sun. That alone is sufficient to negate any just cause or excuse defense. And Defendant's other arguments are equally unavailing.

First, he asserts that Mr. Reznik advised him to: (1) keep the Ferrari in a safe and neutral location; (2) not return it to Ms. Sun or Mr. Curtis. This was apparently based on Mr. Reznik's theories that: (1) there were triable factual questions about who the vehicle's equitable owner was; and (2) Defendant's transfer of the Ferrari's title to Ms. Sun would be set aside (ECF No. 94, p. 5). But this does not

amount to just cause or excuse. To start, the court rejects Defendant's suggestion that Mr. Reznik told him he could take the car. Mr. Reznik testified that when he first met with Defendant, he already had the Ferrari. Yet Defendant asserted that Mr. Rafael told him the dental scheduling calendar contained the lawyer meeting, and it purportedly showed that Defendant met Mr. Reznik on May 2, 2013, two days before the Ferrari was taken. Mr. Reznik did not exactly recall, but pointed to Monday, May 6, 2013 as the most likely date based on later correspondence. The court credits Mr. Reznik's testimony and not Defendant's. It thus concludes that Defendant did not act on advice of counsel in taking the car. He is not entitled to a just cause or excuse defense to the "malice" prong on that basis.

Second, Defendant's "family sharing" argument is of no moment because Defendant admitted that he needed permission to drive the Ferrari. That he may have thought Ms. Sun held the vehicle in what he called a "custodial trust" is insufficient since, when he took it, she had both title and possession.

Third, the court rejects Defendant's mental "fuzziness" excuse. He remained aware and functional enough to continue practicing dentistry the entire time.

Finally, the court recognizes that Defendant felt wronged and thought he may have legal rights based on undue influence or fraud. But this does not amount to just cause or excuse, either. Malice is an objective inquiry. And under *Bammer*, subjective intent cannot justify or excuse behavior that is otherwise wrongful. What Defendant subjectively thought his legal rights and remedies were is consequently inapposite—especially since he took the car before hearing legal advice on the point. The court finds that a reasonable

person in Defendant's position would not have removed the Ferrari knowing that it was owned and possessed by another. It was not justifiable. It amounted to illegal self-help, no matter how aggrieved he felt or how much he loved the Ferrari.

Accordingly, the court finds that Plaintiff has established Defendant's maliciousness under § 523(a)(6).

## V. DAMAGES AND EXTENT OF NONDISCHARGEABILITY

Now to damages. The measure of § 523(a)(6) conversion damages is the value of the property taken. Here, the parties agree that the unrecovered balance of Plaintiff's claim—after accounting for the funds garnered at auction—is $42,003.51. *See* the Pre–Trial Order at ¶ 10. And because Plaintiff has established that Defendant intentionally, wrongfully, willfully, and maliciously converted the Ferrari, its entire subrogation claim is **nondischargeable** under § 523(a)(6).

Plaintiff also requests costs and interest in both the Complaint and its post-trial brief. Defendant does not argue against either. Accordingly, Plaintiff may submit a bill of costs to the clerk of court in the normal course.

■■■■ As to interest, "[t]he court may award prejudgment interest in consideration of the equities of the case." *In re Zenovic*, BAP No. SC–15–1204–FYJu, 2017 WL 431400, at *7 (9th Cir. BAP Jan. 31, 2017). Pre–judgment interest awards "are governed by considerations of fairness and are awarded when it is necessary to make the wronged party whole." *Purcell v. United States*, 1 F.3d 932, 942–43 (9th Cir. 1993) (citation omitted). It is intended "to compensate for the loss of use of money due as damages from the time the claim

accrues until judgment is entered." *Barnard v. Theobald*, 721 F.3d 1069, 1078 (9th Cir. 2013).

■■■■ The court has broad discretion in determining whether to award prejudgment interest. *Id.* The appropriate prejudgment interest rate in federal court depends on the nature of the claims. It is a substantive aspect of a plaintiff's cause, rather than a procedural mechanism. "State law generally governs awards of prejudgment interest in diversity actions, but federal law may apply to the calculation of prejudgment interest when a substantive claim derives from federal law alone." *In re Zenovic*, 2017 WL 431400, at *7 (quoting *Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*, 513 F.3d 949, 961 (9th Cir. 2008)). In § 523 actions where, as here, a federal court must decide a predominantly state law claim, it may choose to award prejudgment interest at the state law rate. *In re Zenovic*, 2017 WL 431400, at *8.

Under California law, a prevailing plaintiff in a conversion action is entitled to prejudgment interest from the time of the taking to the judgment date. Cal. Civ. Code § 3336(1); *Moreno v. Greenwood Auto Ctr.*, 91 Cal.App.4th 201, 209, 110 Cal.Rptr.2d 177 (2001). In those cases, 7% is the applicable interest rate prejudgment. *Pacific–Southern Mortg. Trust Co. v. Ins. Co. of N. Am.*, 166 Cal.App.3d 703, 716, 212 Cal.Rptr. 754 (1985).

■■■■ Accordingly, the court exercises its discretion and, in light of Defendant's egregious conduct and in the interests of fairness, **awards** Plaintiff **$12,018.92** in prejudgment interest at the 7% state law rate from May 4, 2013 through June 5, 2017.[13] And it further **awards** Plaintiff

---

13. Calculated at $2,940.25 per year (= $42,003.51 × .07) for four years, and $8.06 (rounded) per day (=$42,003.51 × .07 ÷ 365) for 32 days. This yields ($2,940.25 × 4) +

postjudgment interest at the federal rate. *See, e.g., Northrop Corp. v. Triad Int'l Mktg., S.A.,* 842 F.2d 1154, 1155 (9th Cir. 1988) ("It is settled that even in diversity cases '[p]ost-judgment interest is determined by federal law").

## VI. CONCLUSION

Plaintiff has proven all the elements of § 523(a)(6), including the willfulness dimension in both modes. Consequently, its $42,003.51 subrogation claim against Defendant is **nondischargeable in its entirety**. The court also **awards** Plaintiff $12,018.92 in prejudgment interest, for a total judgment of **$54,022.43**. Postjudgment interest will accrue at the federal rate. Plaintiff may submit a bill of costs to the clerk of court in the normal course.

A separate judgment will issue.

IT IS SO ORDERED.

($8.06 × 32). Hence $11,761.00 + $257.92 = $12,018.92 in prejudgment interest.